Joel W. Nomkin (011939)
JNomkin@perkinscoie.com
Clinten N. Garrett (022457)
cngarrett@perkinscoie.com
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000
DocketPHX@perkinscoie.com

Steven E. Blankinship (AZ #030027)
Steven.Blankinship@state.nm.us
GENERAL COUNSEL, GOVERNOR
SUSANA MARTINEZ, AND SPECIAL
ASSISTANT ATTORNEY GENERAL
State Capitol, Room 400
Santa Fe, New Mexico 87501
Telephone: 505.476.2200
Facsimile: 505.476.2226

Attorneys for *Amicus Curiae* State of New
Mexico

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Pierce,<br><br>                    Plaintiff,<br><br>          v.<br><br>Douglas A. Ducey, in his capacity as Governor of the State of Arizona, and the State of Arizona,<br><br>                    Defendants. | No. 2:16-cv-01538-PHX-NVW<br><br>**BRIEF OF *AMICUS CURIAE* STATE OF NEW MEXICO IN SUPPORT OF OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**<br><br>**(With Written Consent of the Parties)** |

1

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

2         New Mexico and Arizona are "sister states" that entered the United States together

3   pursuant to the same federal Enabling Act legislation.  In 1997, Congress amended the

4   New Mexico Enabling Act in a manner that was materially identical to the 1999

5   amendment to the Arizona Enabling Act.  Following those Congressional amendments,

6   New Mexico, like Arizona, has twice amended its constitution to adjust its land trust

7   distributions, based on its understanding and evidence that no further Congressional

8   approval was required.  The contribution from the New Mexico land trust to its

9   beneficiaries varies from year to year, but it is always significant to New Mexico's overall

10  educational budget.[1]  New Mexico therefore has a keen interest in the issues raised in the

11  Application for Preliminary Injunction, including Mr. Pierce's contentions regarding

12  standing, Congressional intent, the equities of an injunction, and the public interest.

13        This *amicus* brief is filed with the consent of the parties.  No persons or entities

14  other than New Mexico have provided financial resources for the brief's preparation.

15

## INTRODUCTION

16        Mr. Pierce asks this Court to frustrate a balance of federalism that was established

17  twenty years ago and has been relied on by both New Mexico and Arizona ever since.

18        In 1997, New Mexico voters approved a ballot initiative to amend and modernize

19  the trust distribution provision in the New Mexico Constitution (Article 12, Section 7).  At

20  that time, Congress departed from its historical practice of copying the pertinent state

21  constitutional language verbatim into the Enabling Act, and instead amended the New

22  Mexico Enabling Act to provide that "[d]istributions from the trust funds shall be made as

23  provided in Article 12, Section 7 of the Constitution of the State of New Mexico."  Soon

24  thereafter, Arizona's legislature and voters approved a similar constitutional

25  amendment—but with a distribution formula very different from New Mexico's—and

26

---

27        [1] In 2007, for example, the income from state trust lands constituted 22% of the
budget of New Mexico public schools, 10% of the budget for the New Mexico School for
28  the Visually Impaired, and 25% of the budget for the New Mexico Military Institute.

1    Congress again amended the Enabling Act to cross-reference the Arizona constitution
2    (Article 10, Section 7).

3    Consequently, in reliance on Congress's incorporation by reference of their
4    respective constitutions in the Enabling Acts, New Mexico and Arizona have collectively
5    amended their constitutions on four separate occasions to adjust their distribution
6    formulas and related provisions.  The Enabling Acts provide that "[i]t shall be the duty of
7    the Attorney General of the United States to" enforce Enabling Act provisions.  In the
8    *fourteen years* since New Mexico amended its constitutional distribution provision
9    without further Congressional approval in 2003, the U.S. Attorney General has not
10   commenced an action or otherwise suggested that New Mexico's exercise of the
11   flexibility afforded by the 1997 Enabling Act amendment was in error.  Nor has any
12   member of Congress ever suggested to New Mexico that Congress's further assent was
13   required for constitutional amendments that are fully harmonized with the Enabling Act.

14   The injunctive relief sought by Mr. Pierce would vitiate the flexibility afforded by
15   Congress in the late 1990s and disrupt democratically-enacted reforms necessitated by
16   changing market conditions and educational needs.  Because the injunction would cause
17   the very harm an injunction should prevent, New Mexico agrees with Arizona that the
18   Application for Preliminary Injunction should be denied.

19                              **FACTUAL BACKGROUND**
20   **A.    New Mexico and Arizona Are Admitted to the United States With
            Restrictions Not Imposed on Any Other State.**

21   New Mexico and Arizona were granted statehood together through enactment of
22   the Enabling Act of 1910.  The Enabling Act vested the states with authority to enact their
23   state constitutions and state laws, and transferred certain federal lands to be held in trust
24   for the benefit of public schools and other state institutions.  *See* Act of June 20, 1910, ch.
25   310, §§ 1–18, 36 U.S. Stat. 557 (New Mexico); *id.* at §§ 19–35 (Arizona).

26   Statehood, however, came with heavy restrictions that "marked a complete and
27   absolute departure from the enabling acts under which other states were admitted to the
28   Union."  *Murphy v. State*, 181 P.2d 336, 344 (Ariz. 1947).  Twenty-three states had been

"admitted without any enabling act," while twenty-three other states were admitted by acts that "left to the legislatures of the states full power and authority to determine how the granted lands were to be sold or leased and how and by whom the monies derived from disposition of the lands were to be kept and preserved." *Id.* Because of abuses by these earlier-admitted states, Arizona and New Mexico received disparate treatment from Congress and were admitted with "restrictive provisions" that severely constrained their management and distribution of the trust property. *Id.* at 352.

### B.    The Enabling Act Is Slowly Modernized.

Certain provisions in the Enabling Act were not merely restrictive, but—with the development of modern investment practices—soon became antiquated and injurious to the trust. Most significantly, the Enabling Act provided that funds could only be invested in "interest-bearing securities," which effectively limited investments to bonds. Enabling Act of 1910; *see also* S. Rep. 105-18 (1997). It further provided that distributions to trust beneficiaries could only be paid from "the income" from investments. *Id.*

In 1957, Congress amended the Enabling Act to permit New Mexico and Arizona to invest in corporate stocks, but there was no accompanying amendment to the provision that distributions could only be paid from income. Pub. L. No. 85-180, 71 Stat. 457 (1957); S. Rep. No. 105-18 (1997). Because interest from bonds has historically been higher than stock dividends, and capital appreciation could not be included in distributions, investments still needed to be concentrated in bonds to maximize distributions. S. Rep. 105-18 (1997); *Testimony for S.430,* Phil Archibeck (New Mexico State Investment Officer), 1997 WL 222196 (May 5, 1997) (trust was "structured to maximize distributions, which meant owning nearly all bonds," rather than "55% to 60% in stocks" like other major endowments).

### C.    New Mexico Amends Its State Constitution, in Parallel With Arizona.

The effective mandate to invest in bonds *and* to distribute all trust income meant that, far from being conservative, the land trust could not keep up with inflation, and would therefore be "self-liquidating" over time. *Testimony for S.430*, Phil Archibeck,

1997 WL 222196 (May 5, 1997).  In 1995, a New Mexico study committee comprised of experts in finance, education, and related fields recommended amendments to the State Constitution to provide for greater flexibility and to protect the land trust against inflation. *Id.*  The following year, the New Mexico legislature passed a resolution seeking to amend the New Mexico Constitution to alter the state's distribution formula for the trust. *See* Senate Joint Resolution 2 of the Forty-Second Legislature, Second Session, 1996.  New Mexico voters then approved a constitutional amendment that provided for annual distributions to be based on a fixed percentage (4.7%) of the five-year average market value of the funds, instead of one based solely on interest and dividend income.  N.M. Const. art. XII § 7, amended by Laws 1996, S.J.R. 2, approved election November 5, 1996.

In 1997, Congress approved the 1996 amendment to the New Mexico Constitution by amending New Mexico's Enabling Act to provide that the trust "shall be prudently invested on a total rate of return basis."  New Mexico Statehood and Enabling Act Amendments of 1997, S. 430, Public Law 105-37 (Aug. 7, 1997).  And in lieu of importing any specific distribution formula into the Enabling Act, the amendment further provided that "[d]istributions from the trust funds shall be made as provided in Article 12, Section 7 of the Constitution of the State of New Mexico." *Id.*  With the amendment, Congress "beg[a]n the process of allowing New Mexico greater flexibility for investment."  105 Cong. Rec. S.2206 (March 12, 1997 ) (statement of Sen. Domenici).

Arizona undertook a very similar amendment process shortly thereafter.  In 1998, Arizona voters approved Proposition 102 to amend Arizona's Constitution to allow greater flexibility in investing the land trust.  But in contrast to the fixed 4.7% distribution in New Mexico, Arizona adopted a distribution formula based on a five-year rolling average of fund performance.  Ariz. Const. art. X, § 7, amended by Laws 1998, S.C.R. 1007, § 4, approved election Nov. 3, 1998.

In 1999, Congress amended Arizona's Enabling Act to conform the changes to Arizona's Constitution and provide that "[d]istributions from the trust funds shall be made

as provided in Article 10, Section 7 of the Constitution of the State of Arizona."  Public Law 106-133, 113 Stat. 1682 (1999).  The amendment also provided that the trust "shall be prudently invested on a total rate of return basis."  *Id.*

This amendment was expressly intended to give "state officials greater flexibility in investing and distributing the assets of the state's permanent funds."  H.R. Report No. 106-40, at 3 (1999).  Consistent with this intent, Congress did not express any preference between—or even concern itself with—the very different distribution formulas New Mexico and Arizona had adopted.  *Compare* N.M. Const. art. XII § 7, amended by Laws 1996, S.J.Res. 2 (New Mexico: 4.7% distribution); *with* Ariz. Const. art. X, § 7, amended by Laws 1998, S.C.R. 1007 (Arizona: distributions based on recent fund performance). The logical import of this is that, having established that management of the trusts is subject to a "prudent investor" standard, Congress was not concerned with the precise mechanics of how the states chose to disburse their funds.

### D. New Mexico Adjusts Its Trust Distribution Percentage in 2003.

New Mexico thereafter relied upon on the flexibility afforded by the 1997 Enabling Act Amendment.  In 2003, the New Mexico legislature approved a resolution to amend the state Constitution and increase the annual distribution from 4.7% to 5%, with a potential additional increase contingent on the value of the trust in future years.  S.J.R. 6, 46th Leg., 1st Sess. (N.M. 2003).  This resolution was based on the legislature's judgment that the increased distribution would "provide important and measurable improvements in the public school system," without eroding trust principal.  New Mexico Legislative Counsel Service, Constitutional Amendments Proposed By the Legislature in 2003 (June 2003), at 11-12.  New Mexico also recognized that with the flexibility afforded by the 1997 Enabling Act amendment, it could also "adjust the distribution rate downward" in the future if circumstances warranted.  *Id*. at 13.

New Mexico then held a special election in September 2003, in which voters approved a constitutional amendment that implemented the increased distribution.  New Mexico did not seek further Congressional approval for this amendment, and no federal

lawmaker or official suggested that such approval was necessary.

### E.   New Mexico and Arizona Continue to Rely on Their Right to Adjust School Funding By Constitutional Amendment.

In 2012, in connection with a contemplated amendment to Article 12, Section 7 of the New Mexico Constitution to increase funding to early childhood learning, New Mexico's Attorney General opined that the 1997 Enabling Act amendment rendered further Congressional approval unnecessary.   2012 Op. Att'y Gen. 12-03, at 9-10 ("changes to exactly how the funds are distributed may be made as long as it is accomplished by an amendment to Article XII, Section 7 and the funds are used for purposes allowed in the Enabling Act.").   That same year, Arizona's voters approved Proposition 118, which amended the Arizona Constitution to provide that land trust distributions would  (as in New Mexico) be based on a fixed percentage of assets, rather than on the recent performance of the trust.   Laws 2012, H.C.R 2056 § 1, Prop. 118, approved election Nov. 6, 2012.

In 2014, the New Mexico legislature approved a resolution to again amend Article 12, Section 7 of the New Mexico Constitution.   This amendment adopted Uniform Prudent Investor Act standards, provided for greater flexibility to invest in foreign securities, and raised the fund reserve requirement necessary to continue making distributions at the rate applicable at that time.   H.J.R. 16, 51st Leg., 2nd Sess. (N.M. 2014). Voters approved the constitutional amendment in the November 2014 general election.

### F.   New Mexico's Initiatives Are Implemented Without Controversy.

The 2003 and 2014 amendments to Article 12, Section 7 of the New Mexico Constitution occurred only after the state legislature and the voting electorate approved the amendments.   Despite the highly-publicized nature of New Mexico's ballot initiatives to amend the state constitution in 2003 and 2014,[2] there was no challenge to the

---

[2]   *See, e.g.,* David Miles and Kate Nash, *Voters to Decide on Changes to Constitution, Albuquerque Journal*, March 23, 2003 (2003 WLNR 3330598) ("New Mexico voters this fall will decide whether to . . . increase the annual income distribution

implementation of these measures by any private citizen.  Nor was there any challenge by the U.S. Attorney General, the U.S. Attorney for the District of New Mexico, the New Mexico congressional delegation, or any other member of Congress or federal official.[3]

**ARGUMENT**

Arizona demonstrates in Opposition that Mr. Pierce has failed to satisfy any of the requirements for a preliminary injunction.  New Mexico's experience confirms that there is no legal or equitable basis for the extraordinarily disruptive relief Mr. Pierce seeks.

With respect to education funding, the law for twenty years has been that New Mexico and Arizona may adjust their trust distributions by constitutional amendment, in reliance on Congress' incorporation by reference of their respective constitutions in the Enabling Act.  Granting an injunction in favor of a single individual who claims no personal harm would undermine long-established law, and inflict senseless injury on trust beneficiaries.

**A.   The Merits Strongly Favor Arizona's Position.**

According to Mr. Pierce (at 4-5), "all evidence indicates that Congress never intended to" permit the amendment to Arizona's Constitution effected by Proposition 123.  To the contrary, as Arizona demonstrates in its opposition brief, this bare assertion is contrary to the text of the Enabling Act, the weight of legislative history, and the historical context of Proposition 123.

New Mexico's experience is central to this historical context, because New Mexico

---

from a permanent fund"); Jeff Tucker, *All 5 Constitutional Amendments Ratified*, Nov. 6, 2014 (2014 WLNR 31074713) (constitution amended to "increase[e] the duty of care" and make other changes to the land grant permanent fund).
    [3] Likewise, New Mexico understands that there was no challenge to the 2012 Arizona constitutional amendment.  More recently, Senators McCain and Murkowski have affirmatively confirmed that they do not believe Congressional approval is necessary.  *See* Ariz. Statehood and Enabling Act Amendments of 1999, 116 Cong. S8876 (Dec. 18, 2015) (Sen. McCain: "My understanding is that this reference to the Constitution of the State of Arizona, in section 28 of the enabling act, authorizes the voters of the State of Arizona to amend their constitution to authorize different distributions than those in place in 1999"; Sen. Murkowski: "because Congress specified that distributions may be made as determined in article 10, section 7, of the Arizona Constitution . . . Congress need not provide consent.").

1    approved similar constitutional amendments in 2003 and 2014 without further
2    Congressional approval.  The Enabling Acts of both states provide that "[i]t shall be the
3    duty of the Attorney General of the United States to prosecute . . . such proceedings at law
4    or in equity as may from time to time be necessary and appropriate to enforce the
5    provisions hereof."   In the intervening fourteen years since New Mexico's 2003
6    amendment (and the three years since the 2014 amendment) the U.S. Attorney General
7    has never suggested any basis exists for an enforcement action, let alone commenced such
8    an action.  Nor has Congress, or any individual member of Congress, indicated that
9    Congressional or other federal action was appropriate.  This is not an accident, and it
10   carries vastly more weight than Mr. Pierce's personal view of Congressional intent.  *See,*
11   *e.g., Johnson v. Transp. Agency, Santa Clara Cty, Cal.*, 480 U.S. 616, 629 n.7 (1987)
12   (Congressional inaction probative of intent where "widely publicized decision that
13   addressed a prominent issue of public debate" did not elicit even proposed legislation
14   from a single legislator).

15        Nor is Congress's acquiescence surprising, as the Enabling Act does not provide
16   that Arizona and New Mexico are precluded from changing their constitutions.  Rather, as
17   Mr. Pierce acknowledges (at 5), only an "amendment to the state Constitution *in conflict*"
18   with the Enabling Act would be problematic.  *Boice v. Campbell*, 248 P. 34, 25 (1926)
19   (emphasis added); *see also Murphy v. State*, 181 P.2d 336, 340 (Ariz. 1947) ("The
20   Arizona Constitution cannot be inconsistent with the Enabling Act.").  Because the
21   Enabling Act was amended in the late 1990s to provide that distributions "shall be made
22   as provided in" the Arizona and New Mexico Constitutions, there is no facial conflict or
23   inconsistency between the Enabling Act and the state constitutional amendments.

24        As Arizona points out, Congress could have limited the states' flexibility—and
25   thereby continued treating Arizona and New Mexico more harshly than other states—
26   either by mirroring the state constitutional amendments in the Enabling Act, as had been
27   past practice, or by adding a single word ("now," "currently") to the constitutional cross-
28   reference.  Congress did neither.  Instead, it established a "prudent investor" standard and

1    allowed New Mexico and Arizona to adopt very different distribution formulas—one
2    based on a fixed percentage of assets, the other based on a rolling average of recent
3    performance—with no preference expressed between the disparate formulas.

4          Consistent with this approach, Congress then cross-referenced the constitutional
5    provisions in a manner that allows for future changes without further amendment to the
6    Enabling Act. *See, e.g., Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 983 (7th
7    Cir. 1992) ("[w]riting a cross-reference rather than repeating the text to be incorporated is
8    useful precisely because the target may be amended").  Arizona and New Mexico's
9    common understanding of the cross-reference also comports with the Arizona Supreme
10    Court's recent rejection of any presumption that a statutory cross-reference is intended to
11    be static. *See Arizona Citizens Clean Elections Comm'n v. Brain*, 322 P.3d 139, 145-47
12    (Ariz. 2014) (Arizona has neither "embraced nor applied" contrary presumption).

13          Mr. Pierce is left to assert that "Congress was a little bit sloppy" (2/7/17 Hearing
14    Tr. 19:4-7), but that is not credible.  Congress used identical language (two years apart)
15    for Arizona and New Mexico, and has declined for twenty years to correct the purported
16    "sloppiness," while both Arizona and New Mexico have repeatedly relied upon the
17    language, as written.

18    **B.     Mr. Pierce's Assertions Regarding Irreparable Harm and the Equities Are Without Support.**

19          **1.     Mr. Pierce Offers No Evidence of Trust Depletion, and Ignores the Legislatively-Determined Benefits of Additional Trust Fund**
20              **Distribution.**

21          Mr. Pierce's motion assumes that increased distribution from the trust will cause it
22    to be depleted from current levels.  But he offers no evidence of the historical or projected
23    future returns of the trust to support this assumption.  Nor does he acknowledge the
24    immediate benefits to the current generation of trust recipients—or the immediate injury
25    they will suffer—without an increase in trust distributions.

26          New Mexico's experience illustrates the flaws in Mr. Pierce's assumptions.  New
27    Mexico carefully considered the impact on the trust of increased distributions in
28    connection with its 2003 constitutional amendment to raise the trust distribution

percentage. In New Mexico's judgment, it does not make sense to focus solely on a nominal distribution percentage, or the nominal value of the trust, without also considering the historical and expected return on the trust, the interests of both current and future trust beneficiaries, and the value of the trust relative to other state resources. *See* New Mexico Legislative Counsel Service, Constitutional Amendments Proposed By the Legislature in 2003 (June 2003).

New Mexico adopted the 2003 amendment based on its judgment that higher educational funding would benefit not only current recipients, but also future generations of trust beneficiaries. *Id.* at 11. In particular, New Mexico found that "[i]ncreased spending on education reform . . . will produce a better education system yielding a more literate work force, along with an enhanced ability to attract new businesses to New Mexico and an opportunity to expand the tax base." *Id.* "Such an investment in children," New Mexico found, "will provide a rate of return to [the state] greater than or equal to investing the money in stocks and bonds." *Id.*

Even with increased trust distributions, New Mexico found that the corpus of the trust was unlikely to decline. *Id.*[4] New Mexico further recognized that "flexibility" works in both directions, and that distributions can also be adjusted downward if warranted by future conditions. *Id.* at 13. Mr. Pierce fails to consider any of these nuanced issues, instead offering bare "speculation that does not rise beyond the mere 'possibility' of harm." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411-12 (9th Cir. 2015) ("impossible to evaluate" alleged injury from minimum wage increase where it was unsupported by evidence of "costs and revenues," "current or future labor costs," or other data).

---

[4] Consistent with this expectation, the trust has increased in value from approximately $6.1 billion in January 2003 to $15.4 billion in January 2017. *See* New Mexico State Investment Council Investment Holdings Report (January 31, 2003), at 2; New Mexico State Investment Council Investment Holdings Report (February 22, 2017), at 2, *available at* http://www.sic.state.nm.us/uploads/FileLinks/149827db93754c1e9e29a6ebdec6dff7/January_2017_Monthly_Reporting_2.pdf/.

1

2.      **The Purported Basis for the Injunction Is Illogical.**

2      Mr. Pierce asserts (at 5) that "Arizona would not suffer irreparable hardship if

3   enjoined from implementing Proposition 123."  But the sole basis for this assertion is that

4   he "seeks only to enjoin Arizona from continuing to implement Proposition 123 until and

5   unless Congress authorizes its implementation."  This is misguided in several respects.

6      First, Mr. Pierce cannot possibly know—particularly in the current political

7   climate—how long the Congressional authorization process would take.  Mr. Pierce

8   would thus hold hostage funding for school children for an indefinite period, subject to

9   action by a third-party (Congress), which Congress has—through legislation, inaction, and

10   affirmative statements—indicated is not required.

11      Second, even if Mr. Pierce could ultimately prevail on the merits of his claim, the

12   contingent nature of his grievance—i.e., that Proposition 123 should be enjoined subject

13   to Congressional approval, not that it must be absolutely enjoined—militates strongly

14   against a preliminary injunction.  *See Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7,

15   32-33 (2008) ("Given that the ultimate legal claim is that the Navy must prepare an

16   [impact study], not that it must cease sonar training, there is no basis for enjoining such

17   training in a manner credibly alleged to pose a serious threat to national security.").  It is a

18   non sequitur to suggest the Proposition 123 could cause "irreparable harm," when Mr.

19   Pierce concedes (as he must) that the only disputed issue is whether Congressional

20   approval is required for its implementation.

21      Third, the distribution percentage in Arizona *before* enactment of Proposition 123

22   was established in 2012 by ballot initiative and constitutional amendment, without further

23   Congressional approval—*exactly like Proposition 123*.  Mr. Pierce does not suggest—nor

24   could he given laches principles—that this preceding amendment must also be enjoined,

25   vitiating the notion that Congressional approval of Arizona's funding reform is a matter of

26   emergency importance.

27   **C.      The Public Interest Weighs Strongly Against an Injunction.**

28      Courts "should pay particular regard for the public consequences in employing the

1    extraordinary remedy of injunction."  *Winter*, 55 U.S. at 24 (quotation marks omitted).

2    Mr. Pierce fails even to *mention* the public interest factor, let alone to demonstrate that it

3    supports entry of an injunction, and thereby fails to carry his burden.  *E.g., Leiva-Perez v.*

4    *Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (plaintiff must make a "certain threshold

5    showing . . . on each" preliminary injunction factor).

6            "The public interest may be declared in the form of a statute."  *Golden Gate Rest.*

7    *Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) (quotation

8    marks omitted); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[I]t is in the

9    public interest that federal courts of equity should exercise their discretionary power with

10   proper regard for the rightful independence of state governments in carrying out their

11   domestic policy.") (quotation marks omitted).  Here, the public interest—in both Arizona

12   and New Mexico—has been repeatedly and definitively expressed through resolutions of

13   duly elected state legislatures, followed by majority votes of the electorates to amend their

14   constitutions.  Granting the preliminary injunction requested by Mr. Pierce would not only

15   upset this democratically-determined status quo in Arizona.  Because of the injunction's

16   potential precedential consequences, it could also throw uncertainty into New Mexico's

17   source of education funding at a time when it can least afford it.  *See, e.g.,* New Mexico

18   Legislative Counsel Service, Constitutional Amendments Proposed By the Legislature in

19   2003 (June 2003), at 12 (New Mexico has "a huge endowment for such a poor state," and

20   its "[s]tudents need the additional money now").

21                                    CONCLUSION

22           In the nearly two decades since Congress granted New Mexico and Arizona greater

23   authority to manage their land trusts, the states have changed their distribution schemes

24   only after rigorous and open democratic deliberation.  The evidence demonstrates that

25   Arizona and New Mexico are exercising their sovereign rights in exactly the manner

26   Congress intended, and—after over 100 years of statehood—in a manner on par with the

27   flexibility afforded to almost every other state in the country.

28           The injunctive relief sought by Mr. Pierce would disrupt rather than preserve the

1    true status quo, and therefore cause precisely the injury an injunction is supposed to

2    prevent.   New Mexico joins with Arizona in urging the Court to deny the application for

3    preliminary injunction.

4

5    March 3, 2017                                **PERKINS COIE LLP**

6                                                 By: /s/ Joel W. Nomkin

7                                                 Joel W. Nomkin
                                                  Clinten N. Garrett
8                                                 2901 North Central Avenue, Suite 2000
                                                  Phoenix, Arizona  85012-2788
9
                                                  Steven E. Blankinship
10                                                State Capitol, Room 400
                                                  Santa Fe, NM 87501
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

⊠   I hereby certify that on March 3, 2017, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Andrew S. Jacob | AJacob@gordonrees.com |
| Timothy Berg | tberg@fclaw.com |
| Theresa Dwyer | tdwyer@fclaw.com |
| Kevin M. Green | kgreen@fclaw.com |
| Michael T. Liburdi | mliburdi@az.gov |
| Kathryn Hackett King | kking@az.gov |
| Dominic E. Draye | Dominic.Draye@azag.gov |
| Keith J. Miller | Keith.Miller@azag.gov |
| Joseph E. La Rue | Joseph.LaRue@azag.gov |

⊠   I hereby certify that on _____, 2017, I served the attached document by [first class mail/hand delivery] on Judge _____, United States District Court of Arizona, 401 West Washington Street, Phoenix, Arizona 85003-2118

⊠   I hereby certify that on _____, 2017, I served the attached document by [facsimile/first class mail/hand delivery] on the following, who are not registered participants of the CM/ECF System:  [insert attorneys' names and addresses here]

s/ Lisa M. S. Bartes

-14-