Robert A. Mandel, SBN 022936
Taylor C. Young, SBN 020743
Peter A. Silverman, SBN 020679
**MANDEL YOUNG PLC**
2390 E. Camelback Rd., Ste. 318
Phoenix, Arizona 85016
(602) 374-4591 (Tel)
(602) 314-5296 (Fax)
rob@mandelyoung.com
courtorders@mandelyoung.com
*Attorneys for Amici Curiae Hon. John S. McCain, III,*
*Hon. Jeff Flake, and Hon. Matthew J. Salmon*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Pierce,<br><br>            *Plaintiff,*<br><br>v.<br><br>Douglas A. Ducey, in his capacity as Governor of the State of Arizona; and the State of Arizona,<br><br>            *Defendants.* | No. CV-16-01538-PHX-NVW<br><br><br>(Assigned to the Honorable Neil V. Wake) |

**BRIEF OF *AMICI CURIAE* HON. JOHN S. MCCAIN, III, HON. JEFF FLAKE, AND HON. MATTHEW J. SALMON IN SUPPORT OF RESPONDENTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

# IDENTITY AND INTERESTS OF *AMICI CURIAE*

*Amici*, the Honorable John S. McCain, III, the Honorable Jeff Flake, and the Honorable Matthew J. Salmon, are current and former members of the United States Congress. Senator McCain and Representative Salmon served as co-sponsors of the Arizona Statehood and Enabling Act Amendments of 1999 (the "1999 Amendments"),[1] pursuant to which Congress modified the provisions of the Enabling Act[2] that address matters of investment and distribution of earnings from Arizona's Permanent Fund to the beneficiaries of the state land trust.[3] *Amici* were members of Arizona's congressional delegation when the State sought confirmation from Congress in 2015 that no further amendment of the Enabling Act would be required to effectuate Arizona's Proposition 123 ("Prop. 123"), which proposed to modify the provisions of the Arizona Constitution that direct the annual distribution of earnings from the Permanent Fund to public and charter schools throughout the State.[4] And *amici* represented Arizona in Congress when a majority of the State's electorate approved of the increase in the annual distributions for a finite period and subject to specified

---

[1]   *See* Pub. L. No. 106-133, 113 Stat. 1682 (1999).

[2]   *See* Arizona-New Mexico Enabling Act, Pub. L. No. 61-219, 36 Stat. 557 (1910).

[3]   Senator McCain is the senior United States Senator from Arizona, having first been elected to the United States Senate in 1986, and later reelected in 1992, 1998, 2004, 2010, and again in 2016 for the term ending January 3, 2023. He previously represented Arizona in the United States House of Representatives from 1983 until 1987. Representative Salmon most recently represented Arizona's 5th congressional district in the United States House of Representatives from January 3, 2012 until January 3, 2017. He previously represented the district, then the 1st district, from January 3, 1995 until January 3, 2001. Mr. Salmon submits this brief solely in his individual capacity as a former member of Congress.

[4]   The Honorable Jeff Flake is the junior United States Senator from Arizona, having been elected in 2012 for the term ending January 3, 2019. He previously represented Arizona to the 107th Congress and to the five succeeding Congresses (January 3, 2001-January 3, 2013).

trust safeguards by voting in favor of Prop. 123[5] in the special election of May 17, 2016.[6]

Based on their experiences, *amici* are familiar with the Enabling Act, the 1999 Amendments, and Prop. 123. *Amici* are familiar with the discretion Congress conferred on Arizona in the 1999 Amendments to authorize—but *only* through the arduous process of amending its Constitution—such annual distributions from the Permanent Fund to the State's public and charter schools as the State deems consistent with its codified duty to manage its land trust and the resultant earnings prudently. *Amici* participated in and are otherwise acquainted with discussions and legal analyses that took place in Congress in 2015 confirming the 1999 Amendments afforded the aforementioned discretion to Arizona and that its exercise of that discretion in the form of Prop. 123 would not require further congressional approval. Further, *amici*, like the other members of Arizona's congressional delegation who reside and vote in Arizona, were exposed to the publicity and public debate surrounding Prop. 123 before its referral to and approval by the State's electorate.

*Amici* have an interest in ensuring the 1999 Amendments are construed by this Court in accord with their text and purpose when evaluating Mr. Pierce's preliminary injunction application (the "Application"), and, in particular, his contention that he is likely to succeed on the merits of his claims. They also have an interest in ensuring that this Court, in assessing the balance-of-equities and the

---

[5]    Laws 2015, 1st S.S., H.C.R. 2001, § 1, Prop. 123, approved election May 17, 2016, eff. May 26, 2016.

[6]    All parties except for Mr. Pierce have consented to the filing of this brief. *Amici* represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief, and no person—other than *amici* or their counsel— contributed money that was intended to fund the preparation or submission of this brief.

public interest, has pertinent and reliable information at its disposal pertaining to the procedural hurdles that a new—and, in Congress's view, entirely *unnecessary*—bill to amend the Enabling Act again would confront. In light of those interests, *amici* submit this brief to address two matters in particular.

The first of those matters is Mr. Pierce's contention that the Enabling Act, in directing that "[d]istributions from the trust funds shall be made as provided in Article 10, Section 7 of the [Arizona] Constitution," constrains the State to distribute earnings only as Article 10, Section 7 prescribed *in 1999*, irrespective of whether Arizona's electorate later amends that constitutional provision to authorize a different distribution formula or amount, as it did in approving Prop. 123. The second is Mr. Pierce's contention that, if Congress concurs with Governor Douglas A. Ducey's and the State's (collectively, "Respondents") arguments, it will "fix" the Enabling Act, rapidly. As *amici* are aware from their own experiences, Mr. Pierce's contentions are irreconcilable with the text and purpose of the 1999 Amendments and the realities of the legislative process. His assertions are also incompatible with the primary purpose of the state land trust—*i.e.*, to ensure Arizona's public and charter schools have the funding they need to educate the State's children.

## ARGUMENT

In one fell swoop, Mr. Pierce seeks to frustrate both the will of Congress to afford Arizona greater latitude in managing its education-funding system and the will of Arizona's Governor, Legislature, and most importantly, *voters*, to ensure there is adequate funding for Arizona's cash-strapped public and charter schools. His preliminary injunction initiative is flawed, dangerous, and contrary to the public interest. It should be indulged no further.

# I.   PROP. 123 COMPLIES WITH THE ENABLING ACT AND REQUIRES NO CONGRESSIONAL APPROVAL.

Relying exclusively on his reading of the House and Senate Reports accompanying House Bill 747 ("H.B. 747") and Senate Bill 415 ("S. 415), Mr. Pierce urges this Court to find the 1999 Amendments, in directing that "[d]istributions from the trust funds shall be made as provided in Article 10, Section 7 of the [Arizona] Constitution," could only "logically" have been referring to the distribution formula "*then* stated in Article 10, Section 7 [in 1999]." *See* Appl. at 5:17-27 (emphasis added). Based on that premise, Mr. Pierce asserts that Prop. 123, which in 2016 amended the provisions of Article 10, Section 7 governing distributions, is in "direct conflict" with the Enabling Act and must be approved by Congress to become effective.

## A.   The Unambiguous Text of the 1999 Amendments Eliminated the Need for Congressional Authorization of Modifications to the Trust Fund Distribution Formula by Arizona's Voters.

Mr. Pierce's argument violates basic rules of statutory construction. Federal courts, in resolving disputes that turn on the interpretation of a statute, look first to its text and construe it in accord with its "plain meaning" when it is unambiguous. *E.g.*, *Metro One Telecommunications, Inc. v. C.I.R.*, 704 F.3d 1057, 1063 (9th Cir. 2012) ("It is already well-settled that, in the realm of the canons of statutory construction, the plain meaning rule is 'preeminent.'"); *see also United States v. Gonzalez-Torres*, 309 F.3d 594, 599 (9th Cir. 2002). Here, by virtue of the 1999 Amendments, the interest- and income-only restrictions of the Enabling Act were repealed and replaced with the directive that "[d]istributions from the trust funds shall be made as provided in Article 10, Section 7 of the Constitution of the State of Arizona." As the text of that statutory provision is not facially ambiguous in the least, the provision must be construed in accord with its plain meaning rather than Mr. Pierce's subjective reading of the House and Senate Reports.

The plain meaning of the 1999 Amendments is that the State, when distributing trust funds to the beneficiaries, must comply with the formula that Article 10, Section 7 of the Arizona Constitution prescribes at that time. To contend otherwise would be to endorse the proposition that the text of the 1999 Amendments proscribes any effort by the people of Arizona to amend the distribution provisions of Article 10, Section 7 of the Arizona Constitution, as they did through Prop. 123 in 2016 (and through Proposition 118 in 2012), or any effort by the State to distribute trust funds in accordance with those amendments. Nothing in the text of the 1999 Amendments supports that sweeping assertion. Because Mr. Pierce's interpretation would require this Court to read new, restrictive language into the 1999 Amendments—*i.e.*, "as provided in Article 10, Section 7 of the Constitution of the State of Arizona [in 1999]"—it represents an impermissible departure from the plain meaning of the text and must be rejected.

The foregoing plain meaning analysis of the 1999 Amendments correctly reflects Congress's intent that future changes to the distribution formula would no longer require congressional oversight. Instead, such changes must be effected through amendments of Article 10, Section 7 of the Arizona Constitution by the State's electorate and comport with the State's fiduciary duties. The purpose of using a simple statutory cross-reference like the one Congress placed in the 1999 Amendments is to allow for amendments to the cross-referenced legislation without having to rewrite the referencing statute. *E.g.*, *Hermann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 983 (7th Cir. 1992) ("Writing a cross-reference rather than repeating the text to be incorporated is useful precisely because the target may be amended.") (Easterbrook, J.). If Congress had wanted to lock Arizona into the specific distribution mechanism that was embodied in Article 10, Section 7 of the Arizona Constitution as of 1999, H.R. 747 and S. 415 would have been formulated differently.

Congress would either have incorporated the distribution provisions of Article 10, Section 7 into the 1999 Amendments verbatim, or it would have cross-referenced "Article 10, Section 7" together with specific text freezing the cross-referenced provision in time. Congress's decision not to employ those conventions in 1999 was not a matter of "sloppiness," as Mr. Pierce previously represented to this Court. *See* Transcript of Proceedings of February 7, 2017 (Feb. 7, 2017 Tr.) at 19:4-7 and 28:17-19. The unambiguous text of the 1999 Amendments demonstrates that Congress did exactly what it meant to do.

Finally, the changes effected to the trust fund distribution formula by Prop. 123 comply with the plain meaning of the Enabling Act in every respect. The 1999 Amendments provide that "[d]istributions from the trust funds shall be made as provided in Article 10, Section 7 of the [Arizona] Constitution" and Prop. 123 satisfies that requirement by amending Article 10, Section 7(G) of the Arizona Constitution. Prop. 123 was approved nearly a year ago. If the United States Department of Justice or the United States Attorney's Office had perceived the 1999 Amendments and the amended version of Article 10, Section 7(G) to be incompatible, they presumably would have acted to enjoin enforcement of Prop. 123. Further, *amici* were members of Arizona's congressional delegation and residents of Arizona when Prop. 123 was referred to the ballot in 2016. They were aware of the measure. Indeed, as discussed below, they sought and received confirmation of Arizona's interpretation of the 1999 Amendments from Congress months before it was referred to the ballot.

**B.     The Legislative History and Context of the 1999 Amendments Reflect Congress's Intent to Eliminate the Need for Congressional Authorization of Modifications to the Trust Fund Distribution Formula by Arizona's Voters.**

Even if Congress had not fashioned the 1999 Amendments as plainly as it did, the legislative history and other evidence corroborates that Congress intended to

confer upon Arizona the discretion to authorize—but *only* through the painstaking process of constitutional amendment—such annual distributions of trust funds to the trust beneficiaries as the State deems consistent with its codified duty to manage the trust and its earnings prudently.

In late 2015, Senator McCain, a sponsor of S. 415 in Congress, sought and received confirmation from the Honorable Lisa Ann Murkowski of Alaska, Chair of the same United States Senate Committee that reported S. 415 for chamber action in 1999—*i.e.*, the Energy and Natural Resources Committee—that the 1999 Amendments extinguished the need for congressional approval of changes to the distribution formula set out in Article 10, Section 7 of the Arizona Constitution. The following passages from their recorded colloquy are illuminating:

> Mr. MCCAIN: * * * The [1999 Amendments] repealed strict investment and distribution limitations imposed on the fund by the Congress in the State's enabling act. *It also granted the voters of . . . Arizona the authority to adjust distributions to the fund beneficiaries*. To accomplish that objective, Congress specifically amended section 28 of the [Enabling Act] to read, "Distributions from the trust funds shall be made as provided in article 10, Section 7 of the Constitution of the state of Arizona."
>
> The Congressional Budget Office estimate, which was included in the House . . . Committee report, indicated that "[e]nactment of this bill would give Arizona state officials greater flexibility in investing and distributing the assets of the state's permanent funds."
>
> My understanding is that this reference to the Constitution of the State of Arizona, in section 28 of the enabling act, *authorizes the voters of the State of Arizona to amend their constitution to authorize different distributions than those in place in 1999*, including distributions that may pay out more funds to the beneficiaries. I ask the senior Senator from Alaska: Would she agree?

-8-

Ms. MURKOWSKI: *  *  * In 1999, Congress amended the 1910 act, eliminating the distribution requirement and providing that such distributions be made as provided for in . . . article 10, Section 7. Thus, *as I understand it, so long as changes to the education-funding distributions are accomplished by amendments to article 10, Section 7 . . ., and the funds are used for the beneficiaries of the enabling act, the changes to funding distribution amounts from the State land trust are proper.*

Mr. MCCAIN. *  *  * I have one further question. *I believe, should the voters of the State of Arizona change the amounts distributed to the fund beneficiaries by amending article 10, section 7 of the Arizona Constitution, that the consent of Congress is not required prior to the change taking effect.* Would the Senator agree?

Ms. MURKOWSKI: Senator McCain, *because Congress specified that distributions may be made as determined in article 10, section 7, of the Arizona Constitution, I share his view Congress need not provide consent.*

Ariz. Statehood & Enabling Act Amendments of 1999, 161 Cong. Rec., S8876-77 (Dec. 18, 2015) (emphasis added), a true and correct copy of which is attached as Exhibit 16 to the Declaration of Theresa Dwyer, dated February 28, 2017 ("Dwyer Decl."). [Doc. 77-1]

Congressman Salmon received an analogous confirmation from the Congressional Research Service ("CRS").[7] CRS legislative attorney Sarah Herman, in

---

[7]    CRS is a legislative branch agency within the Library of Congress that works exclusively for Congress, providing policy and legal analysis to committees and members of both chambers regardless of party affiliation. According to the Library of Congress, a CRS analysis is "confidential, authoritative, objective and nonpartisan[,]" assuring "Members, as they engage in debate, that the analysis they rely on is as accurate as it is current." The reports and memoranda of CRS, "while not legally binding, are used by Members and committees of Congress in their legislative deliberations and decision making." *See* https://www.loc.gov/crsinfo/about/

her memorandum to Mr. Salmon dated December 21, 2015, stated in pertinent part: "The 1999 Amendments . . . authorize Arizona to specify in its constitution how to make fund distributions. Because Prop. 123, if passed, would amend Arizona's constitution to specify a fund distribution procedure, *Prop. 123 would appear to be consistent with the amendments' instruction that distributions be made according to Arizona's constitution. Consequently, there does not appear to be any need for Congress to amend the Arizona Enabling Act or to take any other action in order for Prop. 123 to go into effect.* Indeed, Arizona has previously made similar changes without congressional approval. . . . Consistent with the Arizona 2012 constitutional amendments precedent, Prop. 123 would not appear to require congressional action to become effective. Moreover, New Mexico has achieved similar goals without Congress amending New Mexico's comparable enabling legislation."). Memorandum from Sarah Herman, Legislative Attorney, Congressional Research Service, to the Honorable Matt Salmon, dated December 21, 2015 (emphasis added), a true and correct copy of which is attached as Exhibit 13 to the Dwyer Decl. [Doc. 77-1]

Senator Flake received essentially the same advice from CRS. CRS's legislative attorney, in her memorandum dated December 11, 2015, stated in pertinent part: "There is a reported dispute between Governor Ducey and Arizona State Treasurer Jeff DeWit about whether the Governor's proposal [Prop. 123] requires Congress to further amend the Arizona Enabling Act. . . . *The Governor's position appears correct.* The 1999 amendments mandate that fund investments be made prudently, and Governor Ducey and Treasurer DeWit appear to disagree about whether the Governor's proposal meets that fiduciary requirement, which is a matter for the courts to determine. . . . Indeed, Arizona has previously made similar changes without congressional approval: In 2012, Arizona amended its constitution to specify that distributions from the fund would be 2.5%. Now Arizona seeks to do the same thing,

but with a larger distribution percentage. That said, Congress, if it so chooses, could further amend the Arizona Enabling Act to define "prudent investing." *For now, though, it appears that no action by Congress is needed for the Governor to pursue his proposal. Moreover, New Mexico has achieved similar results without Congress amending New Mexico's comparable enabling legislation.*" *See* Memorandum from Sarah Herman, Legislative Attorney, Congressional Research Service, to the Honorable Jeff Flake, dated December 11, 2015 (emphasis added), attached as Exhibit 14 to the Dwyer Decl. [Doc. 77-1].

## II.   MOVANT GROSSLY UNDERESTIMATES THE TIME AND EFFORT REQUIRED TO MAKE LAW IN THE U.S. CONGRESS.

Mr. Pierce asserts that Congress need only "fix" the Enabling Act to accommodate Prop. 123, and he insinuates that this would happen rapidly after introduction of a bill. There is no reason, however, to "fix" legislation that all interested parties except for Mr. Pierce agree is not broken. As the unambiguous text, legislative history, and context of the legislation demonstrate, the 1999 Amendments conferred upon Arizona the discretion to authorize such annual distributions of trust funds to the trust beneficiaries as the State deems consistent with its codified duty to manage the trust and its earnings prudently, provided Arizona's electorate authorizes the distribution formula or amount through constitutional amendment. In all events, Mr. Pierce offers this Court nothing more than baseless conjecture to support his suggestion that Congress would pass a measure to amend the Enabling Act quickly. And, Mr. Pierce glosses over the fact that any such bill would require presidential signature as well.

Although Congress would proceed as expeditiously as circumstances would permit to consider a bill to amend the Enabling Act, the timing and outcome are not assured. A bill to amend the Enabling Act would have to traverse the same path as

most other measures in Congress. In the One Hundred Fourteenth Congress, less than 4% of proposed bills and joint resolutions became law.[8]

New bills are sent to standing committees based on their subject matter, and, because the volume of bills and other measures is so large—more than 10,000 in the One Hundred Fourteenth Congress—most bills are sent directly to subcommittee. As was the case with the 1999 Amendments, another bill to amend the Enabling Act may well be sent to the House Resources Committee, and in the Senate, to the Committee on Energy and Natural Resources and the Subcommittee on Forests and Public Land Management. If a bill to amend the Enabling Act were to be reported out of the committee in the House, it would proceed to a Rules Committee, which sets the conditions for amendment and debate. Rules for debate on the Senate floor are different than in the House. Senators may discuss as much about each bill as they like. No restrictions on amendments are allowed in the Senate. Both houses require a quorum (majority) of its members to be present for a vote. Passage of a bill generally requires a majority vote by the members present.  The bill would require approval by the President.

Against that backdrop, the balance of equities and considerations of public policy tip decidedly against the imposition of a preliminary injunction. While Congress would do what it could as expediently as circumstances would permit to address the panoply of severe economic injuries that an injunction would be expected to inflict on Arizona's public schools, schoolteachers, and students, *see* Response at 14-16 (expounding on the harms that would occasion an injunction), there is no way to be certain how quickly a bill to amend the Enabling Act would move through Congress or even that it would conclude its journey before the end of the current

---

[8]    *See* Declaration of Robert A. Mandel, attached as Exhibit A.

session on January 3, 2018. Meanwhile, paralyzing the State's public schools for a period of that length—indeed, for any period of time—would be nothing short of a public policy disaster for Arizona.

RESPECTFULLY SUBMITTED this 13th day of March, 2017.

### MANDEL YOUNG PLC

By:   */s/ Robert A. Mandel*
     Robert A. Mandel, SBN 022936
     Taylor C. Young, SBN 020743
     Peter A. Silverman, SBN 020679
     2390 E. Camelback Rd., Ste. 318
     Phoenix, Arizona 85016
     (602) 374-4591 (Tel)
     (602) 314-5296 (Fax)
     rob@mandelyoung.com
     courtorders@mandelyoung.com

1

2

3

4

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2017, I electronically transmitted the foregoing documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

5

6 Mark Brnovich
    Attorney General
7 Dominic E. Draye
    Solicitor General
8 Keith J. Miller
    Assistant Solicitor General
9 Joseph E. LaRue
    Assistant Attorney General
10
11 **ARIZONA ATTORNEY GENERAL'S OFFICE**
12 1275 W. Washington St.
13 Phoenix, Arizona 85007-2997
   Dominic.draye@azag.gov
14 Keith.miller@azag.gov
15 Joseph.larue@azag.gov
   SolicitorGeneral@azag.gov
16 *Attorneys for Defendants*
17 *State of Arizona*

Timothy Berg
Theresa Dwyer
Kevin M. Green
**FENNEMORE CRAIG, P.C.**
2394 East Camelback Road, Suite 600
Phoenix, Arizona 85016-3429
tberg@fclaw.com
tdwyer@fclaw.com
kgreen@fclaw.com

Michael T. Liburdi
Kathryn Hackett King
**OFFICE OF THE GOVERNOR**
1700 W. Washington St.
Phoenix, Arizona 85007
mliburdi@az.gov
kking@az.gov

18
19 Andrew S. Jacob
20 Leon B. Silver
   **GORDON & REES LLP**
21 111 W. Monroe St., Ste. 1600
22 Phoenix, Arizona 85003-1736
   ajacob@gordonrees.com
23 *Attorneys for the Plaintiff*
24
25

Theodore B. Olson (admitted *pro hac vice*)
Matthew D. McGill (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
tolson@gibsondunn.com
mmcgill@gibsondunn.com
*Attorneys for Defendant Governor Douglas A. Ducey*

26   */s/ Lisa King*
27 Lisa King

28                                    -14-

# Exhibit A

1  Robert A. Mandel, SBN 022936
2  Taylor C. Young, SBN 020743
   Peter A. Silverman, SBN 020679
3  **MANDEL YOUNG PLC**
4  2390 E. Camelback Rd., Ste. 318
   Phoenix, Arizona 85016
5  (602) 374-4591 (Tel)
   (602) 314-5296 (Fax)
6  rob@mandelyoung.com
7  courtorders@mandelyoung.com
   *Attorneys for Amici Curiae Hon. John S. McCain, III,*
8  *Hon. Jeff Flake, and Hon. Matthew J. Salmon*

9
                  **UNITED STATES DISTRICT COURT**
10
                      **DISTRICT OF ARIZONA**
11

12  Michael Pierce,                          No. CV-16-01538-PHX-NVW
13                        *Plaintiff,*
14  v.                                        **DECLARATION OF**
                                              **ROBERT A. MANDEL**
15
    Douglas A. Ducey, in his capacity as      (Assigned to the Honorable Neil V. Wake)
16  Governor of the State of Arizona; and the
17  State of Arizona,
18                        *Defendants.*

19         Robert A. Mandel hereby declares as follows:

20         1.      I am a member of the law firm Mandel Young plc ("MY"), counsel of record for

21  *amici curiae* Hon. John S. McCain, III, Hon. Jeff Flake, and Hon. Matthew J. Salmon in this action.

22  I am licensed to practice law in the State of Arizona and am admitted to practice in the United

23  States District Court for the District of Arizona.

24         2.      Attached as Exhibit A.1 is a true and correct copy of the *Final Résumé of*

25  *Congressional Activity* for the First Session of the One Hundred Fourteenth Congress. This record

26  was obtained by an MY attorney working under my supervision from the official website for U.S.

27  federal legislative information, "Congress.gov."

28

1        3.     Attached as Exhibit A.2 is a true and correct copy of the *Interim Résumé of*

2   *Congressional Activity* for the Second Session of the One Hundred Fourteenth Congress. This

3   record was obtained by an MY attorney working under my supervision from the official website

4   for U.S. federal legislative information, "Congress.gov."

5        4.     According to Exhibits A.1 and A.2, a total of 10,244 bills or joint resolutions were

6   introduced in the One Hundred Fourteenth Congress. Like bills, joint resolutions (except those

7   aimed at amending the U.S. Constitution) require the approval of both Chambers of Congress and

8   the President's signature to become law. Of the 10,244 bills or joint resolutions introduced during

9   the One Hundred Fourteenth Congress, 328 became law.

10        I declare under penalty of perjury under the laws of the United States of America that the

11   foregoing is true and correct to the best of my knowledge, information and belief.

12   Executed on this 13th day of March 2017
     Phoenix, Arizona

13

14

15                               Robert A. Mandel

-2-

# Exhibit A.1

# Final Résumé of Congressional Activity

### FIRST SESSION OF THE ONE HUNDRED FOURTEENTH CONGRESS

The first table gives a comprehensive résumé of all legislative business transacted by the Senate and House.
The second table accounts for all nominations submitted to the Senate by the President for Senate confirmation.

## DATA ON LEGISLATIVE ACTIVITY

### January 6 through December 31, 2015

| | *Senate* | *House* | *Total* |
|---|---|---|---|
| Days in session | 168 | 157 | .. |
| Time in session | 1,073 hrs., 39′ | 804 hrs., 59′ | .. |
| Congressional Record: | | | |
|   Pages of proceedings | 8,913 | 10,717 | .. |
|   Extensions of Remarks | .. | 1,847 | .. |
| Public bills enacted into law | 37 | 78 | 115 |
| Private bills enacted into law | .. | .. | .. |
| Bills in conference | 1 | 1 | .. |
| Measures passed, total | 441 | 525 | 966 |
|   Senate bills | 98 | 38 | .. |
|   House bills | 82 | 323 | .. |
|   Senate joint resolutions | 4 | 3 | .. |
|   House joint resolutions | 3 | 5 | .. |
|   Senate concurrent resolutions | 11 | 6 | .. |
|   House concurrent resolutions | 24 | 28 | .. |
|   Simple resolutions | 219 | 122 | .. |
| Measures reported, total | *289 | *373 | 662 |
|   Senate bills | 219 | 9 | .. |
|   House bills | 36 | 288 | .. |
|   Senate joint resolutions | .. | .. | .. |
|   House joint resolutions | .. | 3 | .. |
|   Senate concurrent resolutions | 1 | .. | .. |
|   House concurrent resolutions | .. | 3 | .. |
|   Simple resolutions | 33 | 70 | .. |
| Special reports | 22 | 7 | .. |
| Conference reports | 4 | 5 | .. |
| Measures pending on calendar | 210 | 78 | .. |
| Measures introduced, total | 2,823 | 5,060 | 7,883 |
|   Bills | 2,427 | 4,302 | .. |
|   Joint resolutions | 28 | 79 | .. |
|   Concurrent resolutions | 26 | 105 | .. |
|   Simple resolutions | 342 | 574 | .. |
| Quorum calls | 6 | 2 | .. |
| Yea-and-nay votes | 339 | **300 | .. |
| Recorded votes | .. | 403 | .. |
| Bills vetoed | 4 | 1 | .. |
| Vetoes overridden | .. | .. | .. |

  *These figures include all measures reported, even if there was no accompanying report. A total of 199 reports have been filed in the Senate, 385 reports have been filed in the House.

  **Totals include Roll Call 300, which was vacated by unanimous consent on June 4, 2015.

## DISPOSITION OF EXECUTIVE NOMINATIONS

### January 6 through December 31, 2015

Civilian nominations, totaling 366, disposed of as follows:

| | |
|---|---|
| Confirmed | 173 |
| Unconfirmed | 181 |
| Withdrawn | 10 |
| Returned to White House | 2 |

Other Civilian nominations, totaling 3,802, disposed of as follows:

| | |
|---|---|
| Confirmed | 3,383 |
| Unconfirmed | 97 |
| Withdrawn | 322 |

Air Force nominations, totaling 5,734, disposed of as follows:

| | |
|---|---|
| Confirmed | 5,550 |
| Unconfirmed | 181 |
| Withdrawn | 3 |

Army nominations, totaling 5,214, disposed of as follows:

| | |
|---|---|
| Confirmed | 3,474 |
| Unconfirmed | 1,740 |

Navy nominations, totaling 3,936, disposed of as follows:

| | |
|---|---|
| Confirmed | 3,931 |
| Unconfirmed | 5 |

Marine Corps nominations, totaling 1,070, disposed of as follows:

| | |
|---|---|
| Confirmed | 1,067 |
| Unconfirmed | 3 |

### *Summary*

| | |
|---|---|
| Total nominations carried over from the First Session | 0 |
| Total nominations received this Session | 20,122 |
| Total confirmed | 17,578 |
| Total unconfirmed | 2,207 |
| Total withdrawn | 335 |
| Total returned to the White House | 2 |

# Exhibit A.2

# Interim Résumé of Congressional Activity

## SECOND SESSION OF THE ONE HUNDRED FOURTEENTH CONGRESS

The first table gives a comprehensive résumé of all legislative business transacted by the Senate and House.
The second table accounts for all nominations submitted to the Senate by the President for Senate confirmation.

### DATA ON LEGISLATIVE ACTIVITY

January 4, 2016 through January 3, 2017

| | Senate | House | Total |
|---|---|---|---|
| Days in session | 165 | 131 | .. |
| Time in session | 780 hrs., 58′ | 633 hrs., 15′ | .. |
| Congressional Record: | | | |
| Pages of proceedings | 7,184 | 7,641 | .. |
| Extensions of Remarks | .. | 1,743 | .. |
| Public bills enacted into law | 72 | 141 | 213 |
| Private bills enacted into law | .. | .. | .. |
| Bills in conference | 2 | 2 | .. |
| Measures passed, total | 485 | 659 | 1,144 |
| Senate bills | 97 | 75 | .. |
| House bills | 141 | 450 | .. |
| Senate joint resolutions | 1 | 1 | .. |
| House joint resolutions | 1 | 1 | .. |
| Senate concurrent resolutions | 13 | 7 | .. |
| House concurrent resolutions | 17 | 27 | .. |
| Simple resolutions | 215 | 98 | .. |
| Measures reported, total | *329 | *495 | 824 |
| Senate bills | 242 | 10 | .. |
| House bills | 49 | 413 | .. |
| Senate joint resolutions | .. | .. | .. |
| House joint resolutions | .. | 2 | .. |
| Senate concurrent resolutions | 6 | .. | .. |
| House concurrent resolutions | 1 | 5 | .. |
| Simple resolutions | 31 | 65 | .. |
| Special reports | 12 | 27 | .. |
| Conference reports | 3 | 3 | .. |
| Measures pending on calendar | 462 | 144 | .. |
| Measures introduced, total | 1,467 | 2,714 | 4,181 |
| Bills | 1,122 | 2,224 | .. |
| Joint resolutions | 13 | 29 | .. |
| Concurrent resolutions | 32 | 78 | .. |
| Simple resolutions | 300 | 383 | .. |
| Quorum calls | .. | 1 | .. |
| Yea-and-nay votes | 163 | 275 | .. |
| Recorded votes | .. | 346 | .. |
| Bills vetoed | 2 | 3 | .. |
| Vetoes overridden | 1 | 1 | .. |

\* These figures include all measures reported, even if there was no accompanying Report. A total of 232 written reports have been filed in the Senate, 525 reports have been filed in the House.

### DISPOSITION OF EXECUTIVE NOMINATIONS

January 4, 2016 through January 3, 2017

Civilian nominations, totaling 354 (including 181 nominations carried over from the First Session), disposed of as follows:

| | |
|---|---|
| Confirmed | 91 |
| Withdrawn | 12 |
| Returned to White House | 251 |

Other Civilian nominations, totaling 2,412 (including 97 nominations carried over from the First Session), disposed of as follows:

| | |
|---|---|
| Confirmed | 2,367 |
| Withdrawn | 1 |
| Returned to White House | 44 |

Air Force nominations, totaling 7,568 (including 181 nominations carried over from the First Session), disposed of as follows:

| | |
|---|---|
| Confirmed | 7,495 |
| Returned to White House | 73 |

Army nominations, totaling 5,899 (including 1,740 nominations carried over from the First Session), disposed of as follows:

| | |
|---|---|
| Confirmed | 5,878 |
| Returned to White House | 21 |

Navy nominations, totaling 4,408 (including 5 nominations carried over from the First Session), disposed of as follows:

| | |
|---|---|
| Confirmed | 4,401 |
| Withdrawn | 2 |
| Returned to White House | 5 |

Marine Corps nominations, totaling 1,246 (including 3 nominations carried over from the First Session), disposed of as follows:

| | |
|---|---|
| Confirmed | 1,245 |
| Returned to White House | 1 |

*Summary*

| | |
|---|---|
| Total nominations carried over from the First Session | 2,207 |
| Total nominations received this Session | 19,680 |
| Total confirmed | 21,477 |
| Total unconfirmed | 0 |
| Total withdrawn | 15 |
| Total returned to the White House | 395 |