1    **WO**

2

3

4

5

6             **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

9    Michael Pierce,                          No.  CV-16-01538-PHX-NVW

10                  Plaintiff,                 **ORDER**

11   v.

12   Douglas A. Ducey, in his capacity as
     Governor of the State of Arizona,

13
                     Defendant.
14

15

16
                        **Table of Contents**
17

18   I.    THE ARIZONA ENABLING ACT AND THE 1998 STATE CONSTITUTIONAL
19         AMENDMENT TO THE FORMULA FOR  SPENDING  INCOME FROM THE
           TRUST FUND...........................................................................................4
20
           A.   The New Mexico-Arizona Enabling Act of 1910 ..................................4
21
           B.   The 1998 Changes to the State Constitution ..........................................7
22   II.   THE 1999 CONGRESSIONAL CONSENT TO THE 1998 ARIZONA
23         CONSTITUTIONAL CHANGES DID NOT SILENTLY REPEAL THE NEED
           FOR CONGRESSIONAL CONSENT TO FUTURE AMENDMENTS ..................9
24         A.   The text of the Enabling Act Amendment consents only to the state constitutional
25              amendments as written. ...........................................................................9
26         B.   The State presented to Congress specific terms for approval and did not ask for
                release from the need for consent to future changes. ............................12
27
           C.   There is no indication in the history of the 1999 Enabling Act Amendments that
28              Congress thought it was abrogating its future trust oversight authority. ..............14

D.   The amendment to New Mexico's Enabling Act demonstrates that Congress did not relinquish its control over that state's trust lands either. ................................. 16

III.   PROPOSITION 123 ................................................................................................ 18

A.   Prelude: The 2012 Amendment to the Distribution Formula ............................... 18

B.   The Substantive Changes in Proposition 123 ........................................................ 20

IV.   PLAINTIFF PIERCE HAS STANDING TO BRING THIS ACTION .................... 21

A.   A trustee's monetary breach is actionable by beneficiaries. .................................. 22

B.   The citizens of Arizona are the beneficiaries of the trust, of which the State is only the trustee. ............................................................................................................ 24

C.   A beneficiary has standing and a case or controversy in federal court to remedy a breach of trust on its own. .................................................................................... 26

D.   Pierce and all citizen trust beneficiaries suffered an injury in fact. ...................... 27

E.   This Court has federal question jurisdiction. .......................................................... 30

V.   REMEDY FOR PAST VIOLATIONS AND FURTHER BRIEFING .................... 31

This is an action by Plaintiff Michael Pierce against Defendant Douglas A. Ducey, Governor of Arizona, to enjoin the spending of monies from the State's school land trust fund. Pierce alleges that the State is in breach of the trust established in the Arizona Enabling Act. The case is pending before the Court on the State's Motion to Dismiss (Doc. 54), Governor Ducey's Motion to Dismiss (Doc. 56), and the Defendants' Joint Motion to Dismiss (Doc. 62) largely on grounds of lack of subject matter jurisdiction due to Plaintiff Pierce not having standing to bring this action. It is also before the Court for decision on the merits based originally on Plaintiff's Motion for Preliminary Injunction (Doc. 45), which was converted to a final trial. The parties agreed at the hearing that the case was appropriate for final judgment on the briefs and evidence submitted on those motions. The dispositive facts are undisputed. (Doc. 102 at 5-8.) *See* Fed. R. Civ. P. 56(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing.").

Three days ago the case took on a new character when Congress enacted in the Consolidated Appropriations Act a consent to the 2016 amendments to the Constitution of Arizona:

> Congress consents to the amendments to the Constitution of the State of Arizona proposed by House Concurrent Resolution 2001 of the 52nd Legislature of the State of Arizona, First Special Session, 2015, entitled "A Concurrent Resolution Proposing an Amendment to the Constitution of Arizona; Amending Article X, Section 7, Constitution of Arizona; Amending Article XI, Constitution of Arizona, by Adding Section 11; Relating to Education Finance", approved by the voters of the State of Arizona at the special election held on May 17, 2016.

H.R.1625 - Consolidated Appropriations Act, 2018: Title IV—Consent of Congress to Amendments to the Constitution of the State of Arizona, at pages 1893-94, https://www.congress.gov/115/bills/hr1625/BILLS-115hr1625eah.pdf.

The case can be narrowed considerably at this time. The pending motions to dismiss for lack of standing will be denied. The Motion for Preliminary Injunction can be terminated as having been consolidated with trial on the merits. The case is now moot

to the extent of school land trust fund distributions from this time forward. But as discussed below, the dispositive inquiry now becomes whether the past excess trust fund distributions before the March 23, 2018 congressional consent are still remediable or are now validated retroactively and therefore moot also. Further briefing will be necessary on those newly arisen and last remaining questions.

By virtue of state constitutional amendments in 2012 and 2016 Arizona unilaterally expended monies well beyond what Congress had approved in 1999. Arizona invaded the principal of the trust to the detriment of future Arizona school children, who were supposed to have the benefit of a perpetual, undiminished trust fund from which only the income could be spent by any generation. Invading the principal was not necessary for the State's unilateral action to be illegal at the time; it merely made it more illegal.

The State contends that in 1999 Congress repealed its future Enabling Act control on how much the State can spend when it consented to the terms of an Arizona constitutional amendment then before it for approval. The text and the history of the 1999 Enabling Act amendments refute that contention. Arizona asked Congress to approve only the changes then proposed. It did not ask Congress to repeal the Enabling Act provision requiring congressional approval of future changes to the trust. The text of the congressional consent does not extend to repeal of the consent requirement. The history and records of the Enabling Act Amendments repeatedly and unqualifiedly describe and approve only the specific changes then requested.

If the case is not moot in its entirety, Plaintiff Pierce has standing to maintain this action. Section 28 of the Enabling Act provides, "Nothing herein contained shall be taken as in limitation of the power of the State or of any citizen thereof to enforce the provisions of this act." 310 Stat. at 575. That term preserves the rights of citizens, not just the State, to enforce the trust under state trust law. There are constitutional limits on how widely Congress can empower ordinary citizens with standing to sue in federal court to enforce federal statutes that affect them the same as everyone else. But Congress did

not create a federal private right of action to enforce the Act.  It created property.  That property, expressly denominated as a trust in land and the rents and sale proceeds thereof, has the citizens of Arizona as beneficiaries and the state government as trustee.  Congress expressly confirmed the State as trustee and the citizens as beneficiaries, retaining the rights they have under state law to relief against violations of the terms of the trust.  That includes beneficiary rights against the State and its legislature, which Congress repeatedly identified as the main threat to the trust.  Pierce is suing as a beneficiary of a trust to remedy dissipation of monies in breach of trust terms.

As a matter of local law, which applies to all property, including federally created property, beneficiaries of trusts may sue to restrain and remedy monetary breaches of trust, no matter how numerous the wronged beneficiaries are.  There is no principle of trust law, in Arizona or anywhere, that exempts defalcations of funds that are too big and that hurt too many people.  By making Arizona citizens trust beneficiaries and explicitly preserving their rights under state law, Congress assured the beneficiary-citizens would not have to rely on state officers as the policemen of their own misconduct.  Congress knew from history how pervasive that misconduct had been in other states and was unwilling to leave the new states' officers on the honor system.  The history of our State and our sister state New Mexico's frequent runs on the school trust funds shows how critical it was to vest the citizens with beneficiary rights against the doings of their own legislature.   Congress intended and said exactly that and achieved it under ancient principles of property law.  Pierce has standing to remedy by injunction the subsisting violations of trust property rights at the hands of the State itself, if they have not been cured by Congress.

Therefore, the case now narrows to the meaning and scope of the March 23, 2018 congressional consent.  The discussion that follows shows why that meaning and scope is now the last and dispositive question in this case.

## I.   THE ARIZONA ENABLING ACT AND THE 1998 STATE CONSTITUTIONAL AMENDMENT TO THE FORMULA FOR SPENDING INCOME FROM THE TRUST FUND

### A.   The New Mexico-Arizona Enabling Act of 1910

When Congress has admitted new states to the Union, it has given federal lands to new states in trust for certain purposes since admitting Ohio in 1803.  Timothy M. Hogan and Joy E. Herr-Cardillo, *100 Years of Keeping the Trust: The Historic Role of the Judiciary in Protecting Arizona's State Land Trust*, 44 Ariz. St. L. J. 589, 590 (2012).  Conditions frequently "restrict how states [can] use the lands granted to them by the federal government."  Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union*, 34 Am. J. L. Hist. 119, 129 (2004).

The New Mexico-Arizona Enabling Act of 1910, Pub. L. No. 61-219, 36 Stat. 557 (1910) (the "Enabling Act"), granted to the new states "large tracts of land . . . for the support of public education and other critical public institutions."  Hogan and Herr-Cardillo, 44 Ariz. St. L. J. at 589-90.  Arizona received roughly 10 million acres of land to hold in trust.  *Id.* at 590.  Congress granted trust lands for twelve categories of beneficiaries, including penitentiaries, charitable institutions, technical colleges, and hospitals for disabled miners.  *Id.* at 590-91.  The "vast majority" of the land, however, was granted "for the support of common schools."  *Id* at 590.

The House bill was similar to earlier states' enabling acts as to trust lands.  But Senator Albert J. Beveridge, Chairman of the Senate Committee on Territories, discussed in the Senate report how and why the Senate went a different, much more restrictive, way.  S. Rep. No. 61-454), at 1 (1910).  Many of the Senate changes were "of much importance."  *Id*.  One important change was the Senate bill's "careful and rigid" restrictions on trust lands.  *Id.*, at 18.

Arizona's Enabling Act is much more restrictive than previous states' acts.  *See Murphy v. State*, 65 Ariz. 338, 350, 181 P.2d 336, 344 (1947) ("[T]he Enabling Act for . . . Arizona marked a complete and absolute departure from the enabling acts under

which other states were admitted to the Union."). Describing the "sad experience of Congress" with older states, the *Murphy* court explained that the legislatures of other states had left their trust lands and monies "so poorly administered, so unwisely invested and dissipated," that it "left a scandal in virtually every state."[1]  *Id.*  In evaluating admission conditions to impose on Arizona and New Mexico, Congress took note of one such instance of abuse in New Mexico itself.  The Territory had unlawfully disposed of timber on lands granted to it by the federal government in 1898, resulting in a series of lawsuits by the Justice Department.  S. Rep. No. 61-454, at 20.  In short, "[b]ecause of a history of fraud and abuse[,] . . . the trust created for Arizona was deliberately strict regarding expenditures of trust funds."  Hogan and Herr-Cardillo, 44 Ariz. St. L. J. at 591.

Congress thus meticulously crafted the Enabling Act.  Senator Beveridge pointed to "the extreme care that should be taken with every provision of a bill like this."  S. Rep. 61-454, at 33.  "Every other law Congress can enact can be repealed, amended, modified—but not a statehood bill.  Therefore every line of it should be wrought out with painstaking care not required of any other form of legislation."  *Id.*, at 34.  Once the state was admitted, it would be nigh impossible for Congress to unilaterally strengthen the protections of trust lands and funds.  "The experience of the past caused the Congress of the United States to lose confidence in the effectiveness of legislative control and handling of granted land."  *Murphy,* 65 Ariz. at 352, 181 P.2d at 344.  The bill as passed included the Senate's additions and amendments.

Crucially, the Enabling Act creates a trust for the federally granted lands:

---

[1] The fraud and abuse other states exhibited was quite brazen.  In the twenty-three previously admitted states that had some version of an enabling act, Congress left to the state legislatures the "full power and authority to determine how the granted lands were to be sold or leased and how and by whom the monies derived from disposition of the lands were to be kept and preserved for the purposes for which the lands had been granted."  *Id.*  Congress repeatedly failed to designate anyone "to keep invested funds derived from disposition of granted lands."  *Id.* at 351, 181 P.2d at 344.  This blanket discretion and lack of oversight led to large-scale squandering of trust lands and funds for improper purposes.  *Id.*

- 5 -

**Sec. 28.**  That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to said Territory, are hereby expressly transferred and confirmed to the said State, *shall be by the said State held in trust*, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, *shall be deemed a breach of trust*.

36 Stat. at 574 (emphases added).

The State Constitution mirrored Section 28 of the Enabling Act:

SECTION 1.  [The federally granted lands] *shall be by the State accepted and held in trust* to be disposed of in whole or part, only in manner as in the said Enabling Act and in this Constitution provided, and for the several objects specified in the respective granting and confirmatory provisions.

SECTION 2.  Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands (or the lands from which such money or thing of value shall have been derived) were granted or confirmed, or in any manner contrary to the provisions of the said Enabling Act, *shall be deemed a breach of trust*.

Ariz. Const. art. 10, § 7 (1910) (emphases added.)

The Enabling Act put teeth into that trust.  It required the State to lease or dispose of those lands only to support permanent investment funds for the corresponding trust purpose.  310 Stat. at 575.  It forbade mortgages and required sales and leases to the highest bidder at public auction after advertisement unless the leases were short term.  *Id.* at 574.  The Act further commanded that any "sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed . . . not made in substantial conformity with the provisions of this Act shall be null and void," and it required the Attorney General of the United States to enforce the Act.  *Id.* at 575.

- 6 -

Section 20 of the Enabling Act required Arizona to write the trust land protections into the state constitution itself and to "positively preclude the making by any future constitutional amendment of any change or abrogation . . . in whole or in part without the consent of Congress." *See id.* at 569, 571.  Any investments of proceeds from sales of trust lands could be made only in "safe interest-bearing securities." *Id.* at 575.  The proceeds from sale of trust lands were to "be used as a permanent inviolable fund, the interest of which only shall be expended for the support of the common schools within said State." *Id.* at 574.

Arizona agreed to the Enabling Act's trust lands protections and enshrined them in its Constitution, as required.  Article 10, Section 7 of the State Constitution establishes a separate permanent fund for each of the Enabling Act's public purposes.  Ariz. Const. art. 10, § 7(A) (2016).  Whenever the State sells trust land, it must deposit the proceeds into the corresponding permanent fund. *Id.*  The Constitution also prohibits the State from spending fund money on anything that deviates from the fund's purpose or terms. *Id.* § 7(B).  The state may spend only the income from rents and interest on the monies from the sale of lands.  The idea is to preserve a "permanent inviolable fund" for future generations, with each generation taking only the income from the fund.

**B.     The 1998 Changes to the State Constitution**

Congress has amended the Enabling Act several times. *See, e.g.,* Pub. L. No. 70-788, 45 Stat. 1252 (1929) (changing acreage allotted to hospitals for disabled miners); Pub. L. No. 74-658, 49 Stat. 1477 (1936) (changing restrictions on leases and land sale prices and allowing land exchanges).  In 1957 Congress removed the requirement that Arizona invest only in "safe, interest-bearing securities."  Pub. L. No. 85-180, 71 Stat. 457 (1957).  In 1998, Proposition 102 "amended the Arizona constitution to authorize the investment of Permanent Land Trust Fund monies in equity securities," among other purposes.  145 Cong. Rec. H6774 (1999) (statement of Rep. Stump).  The State Constitution now provided that as much as sixty percent of a fund could "be invested in

equities at any time."  Ariz. Const. art. 10, § 7(D)(1) (1998).  Acceptable equity securities included only publicly traded stocks.  *Id.* § 7(D)(2).

Proposition 102 added enough language to Article 10, Section 7 to warrant subsections.  It retained almost all of the original requirements but now also allowed for investment in "prudent equity securities consistent with the requirements of this section."  *Id.* § 7(C).

Given the 1998 authorization of investment in equity securities, the distribution formula needed to change as well, as those securities yield dividends and gains and losses on sale.  The amendment established a board of investment to manage the funds as trustees.  *Id.* § 7(D).  The amendments imposed a prudent-investor standard on the trustees, *id.* § 7(E), and provided that the "earnings, interest, dividends and realized capital gains and losses from investment of a permanent fund, shall be credited to that fund."  *Id.* § 7(F).

Finally, to determine the income that could be distributed from the fund, the investment board was to multiply the average of the annual total rate of return for the preceding five fiscal years, minus the percentage change in the GDP price deflator, by the average of the monthly market values of the fund for the same five years.  *Id.* § 7(G).  The formula worked as follows.  (1) For each of the preceding five fiscal years, add any earnings, interest, dividends, and capital gains and losses—realized and unrealized.  Divide the result by the average monthly market value of the fund for that year to get the annual total rate of return.  Find the mean of all five years to get the average annual total rate of return.  (2) Subtract from the average annual total rate of return the average change in the GDP price deflator for the preceding five fiscal years.  (3) Multiply the difference by the average of the monthly market values for the fund for the preceding 60 months.[2]

---

[2] "Annual total rate of return" referred to "the quotient obtained by dividing the amount credited to a fund pursuant to subsection F for a complete fiscal year, plus unrealized capital gains and losses, by the average monthly market value of the fund for that year."  *Id.* § 7(G)(1)(a).  "GDP price deflator" meant "the gross domestic price deflator reported

In sum, first, the 1998 constitutional amendment allowed for investment in equity stocks, under stated standards, and included net unrealized gains and losses in the calculation of income that could be disbursed for fund purposes.

Second, it provided a rolling five-year average of annual earnings from the fund as the measure of what could be distributed for the current year. This was to improve budgeting stability by evening out the fluctuations in funding amounts that happened when each year's income was the measure of each year's funding.

Third, it fixed a flaw in the original Enabling Act that eroded over time the fundamental purpose of maintaining a perpetual fund without diminishment in principal. That flaw—or oversight—was inflation. The 1998 constitutional amendment required the principal amount of the fund to "grow" by the amount of inflation before income could be distributed.

As with the original text in 1910, under the 1998 formula invading the trust principal was essentially impossible. The net effect was the same as before, except that the greater fluctuations in distributions from one-year measurements were evened out. Only the income as thus calculated could be spent.

## II. THE 1999 CONGRESSIONAL CONSENT TO THE 1998 ARIZONA CONSTITUTIONAL CHANGES DID NOT SILENTLY REPEAL THE NEED FOR CONGRESSIONAL CONSENT TO FUTURE AMENDMENTS

### A. The text of the Enabling Act Amendment consents only to the state constitutional amendments as written.

The 1999 Enabling Act Amendments were Congress's consent to Arizona's 1998 constitutional amendments, incorporating by reference those more detailed financial terms stated in those amendments. Congress changed Section 28 of the Enabling Act to say, "The trust funds (including all interest, dividends, other income, and appreciation in

---

by the United States department of commerce, bureau of economic analysis, or its successor agency." *Id.* § 7(G)(1)(b).

the market value of assets of the funds) shall be prudently invested on a total rate of return basis.  Distributions from the trust funds shall be made as provided in Article 10, Section 7 of the Constitution of the State of Arizona."  Arizona Statehood and Enabling Act Amendments of 1999, Pub. L. No. 106-133, 113 Stat. 1682 (1999).  The constitutional amendment deleted 50 words of existing text and added 561 words, 296 of which stated the distribution formula.  The original 1910 text had and needed no distribution formula; it said only the income could be paid out, and the only income was rents and interest.  It made sense to accomplish the consent by referring to what was consented to rather than restating it fully in the amendment to the Enabling Act.

The State says this consent went far beyond approving the changes in the 1998 constitutional amendment and also repealed entirely Congress's oversight authority over what Arizona does with trust land funds.  Henceforward, the State says, Arizona could amend its Constitution to spend school trust funds however it wants.  It could even invade principal, which indeed it has now done, to the detriment of future school children.

Congress consented to what it saw at the time: the terms and the specific distribution formula stated in Section 7(G) of the 1998 Arizona Constitution.  Congress made clear again in a standalone section of the statute that it was consenting to Arizona's constitutional amendments as written: "Congress consents to the amendments to the Constitution of the State of Arizona . . . ."  113 Stat. at 1682-83.  As a matter of text alone, this is a consent only "to the amendments" that were referenced.  It is not consent to "any" or "future" amendments.  The State argues that Congress did not "freeze" its reference to Article 10, Section 7, perhaps by saying something like "as now written." (Doc. 77 at 8.)  But Congress also did not say "as it may be amended in the future."  *Cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("That the statute could have expressly included the phrase 'former employees' does not aid our inquiry.  Congress also could have used the phrase 'current employees.'").

Most cross-references adopt for enforcement or other purposes a law otherwise valid and enforceable in its own right.  Here, by virtue of the Enabling Act, the Arizona

constitutional amendment was not enforceable in its own right and became enforceable only when Congress approved it.  The State and its allies often quote *Herrmann v. Cencom Cable Associates, Inc.*, 978 F.2d 978 (7th Cir. 1992), to the effect that statutory cross-reference always adopts any change later written into the referenced statute.  "Writing a cross-reference rather than repeating the text to be incorporated is useful precisely because the target may be amended."  *Id.* at 983.  They did not finish reading the case, as it ultimately holds the opposite: that the cross-reference there continued with the same effect even though the referred text was later moved.  *Herrmann* dealt with "a web of cross-references" within an exceedingly complicated federal statute, the Employee Retirement Income Security Act of 1974 ("ERISA").  *Id.* at 980.

The *Herrmann* court did helpfully note the canons that do control here: "Slicing a statute into phrases while ignoring their contexts—the surrounding words, the setting of the enactment, the function a phrase serves in the statutory structure—is a formula for disaster."  *Id.* at 982.  "Any reference may be absolute or relative.  An absolute reference, sometimes called a specific reference, points to the text present at the time the law was enacted and maintains its force even if that text is repealed."  *Id.* at 983.  Indeed, the *Herrmann* court held the statutory cross-reference absolute because a relative reference would not make sense within the context of the entire statutory scheme.  *Id*.

There is no absolute or even general rule that cross-reference to a state statute in a federal statute leaves the cross-referenced statute open to amendment with the continuing power of the federal cross-reference.  Writing a cross-reference within a federal statute, over which Congress has complete control, is different from consent by adoption of an otherwise unenforceable state law.  The State has presented no analogous example of consent by cross-reference to an otherwise unenforceable non-federal law that was held to abolish the need for future consent.

At oral argument Pierce presented a useful thought experiment.  (Doc. 102 at 10.) If Arizona moved its distribution formula to a different place in its Constitution, would that end Congress's supposed abrogation of the consent requirement effected by

expressly cross-referencing Article 10, Section 7?  Congress could not care about the numbering of sections if it did abrogate future consent.  Congress pointed to Article 10, Section 7 because it approved what it saw there, not because it consented in advance to anything that might be written there in the future.  The State says that when Congress said "as provided in Article 10, Section 7 of the Constitution of the State of Arizona," what it really meant was "as provided in the Constitution of the State of Arizona."  Approving specific terms of the State Constitution would be a strange way of legislating that those specific terms will not matter in the future.

Congress would not smuggle a thermonuclear change into a citation to specific terms being approved.  We need look no further than an earlier Arizona Enabling Act case for illustration of that principle of statutory construction:

> [A]n amendment ought not to be interpreted so broadly as to destroy the entire objective of the statutory scheme.  Permitting disposal of vast mineral deposits at less than true value is completely contrary to the objectives sought by the restrictive wording of other portions of the Enabling Act.

*Kadish v. Ariz. State Land Dep't,* 155 Ariz. 484, 491, 747 P.2d 1183, 1190 (1987), *aff'd sub nom. ASARCO Inc. v. Kadish¸* 490 U.S. 605, 630 (1989) (rejecting that interpretation because it "would leave room for all the abuses that the establishment of a school trust was designed to prevent").

The text of the Enabling Act amendment plainly consents only to the pending state constitutional changes and does not abrogate congressional approval authority in the future.  Moreover, an exhaustive review of the Enabling Act, the 1998 State constitutional amendment, and the 1999 amendments to the Enabling Act refutes that contention in every jot and tittle.

### B.   The State presented to Congress specific terms for approval and did not ask for release from the need for consent to future changes.

Pursuant to statute, the legislative council analyzed and described Proposition 102, the 1998 referendum for the voters.  A.R.S. § 19-124(C).  The legislative council said, "The Board of Investment would pay money out of the permanent funds to the designated

- 12 -

state institutions in an amount limited to a percentage of each fund's five-year average market value."   Proposition 102, Arizona Secretary of State (July 21, 1998), http://apps.azsos.gov/election/1998/Info/PubPamphlet/Prop102.html.   They further said the Proposition would allow distribution of that income if Congress approved.   "In order for this proposal to become fully operative, the United States Congress will also have to amend the state Enabling Act to allow all earnings, including capital gains and dividends as well as interest, to be distributed from the permanent funds to the trust beneficiaries." *Id.*

Nowhere did the State suggest that congressional approval would also repeal all future trust lands approval authority.   Nowhere did the State suggest that henceforward on its own it could change the formula for measuring income to be distributed—much less that it could start distributing principal in addition to income, however measured. Governor Jane Dee Hull said exactly the opposite in the official Publicity Pamphlet: "We safely can earn a far greater rate of return on these investments, while simultaneously protecting these assets for future generations of Arizonans.   In fact, under Proposition 102, the higher earnings will be used in part to provide inflation-protection for the principle [*sic*] portion of the trust funds.   Please vote 'yes' on Proposition 102.   Your children and grandchildren will be glad you did." *Id*.

In a prepared statement to the Senate, Scott K. Celley, Executive Assistant to Governor Hull, said the same.   The bill "allows the State Treasurer to invest state trust funds to achieve the greatest financial benefit for the state and its taxpayers.   This aspect of the bill simply changes the Enabling Act to conform to the constitutional changes adopted by Arizona's voters in November 1998." *Arizona Statehood and Enabling Act; National Geologic Mapping; and Conveying Land in Sisters, Oregon: Hearing on S. 415, S. 416, and S. 607 Before the Subcomm. on Forests and Pub. Land Mgmt. of the S. Comm. on Energy and Nat. Res.*, 106th Cong. 3 (1999).   He added:

> Mr. CELLEY.   The purpose of [the] bill is to allow within the State Enabling Act the constitutional change approved by the voters in November in Arizona, and that

was the terms of the change approved by the voters, so what we are trying to do is to make the State Enabling Act consistent with the constitutional change adopted by the people of Arizona.

*Id.* at 6.  Thus, the State sought congressional approval of the *exact terms* Arizona voters approved in 1998 and no more.

Indeed, when at oral argument the Court asked the State to show where it had requested the ability to change its distribution formula without Congress's future consent, the State could point to nothing.  (*See* Doc. 102 at 33-38.)  The entire legislative materials have been reviewed here, and the State pointed to nothing because there is nothing.  The Court further probed whether even an unpublished transmittal from the State to Congress asked for repeal of future congressional consent to trust land changes.  *See* A.R.S. § 44-101(A)(4) (the Governor "[s]hall be the sole official means of communication between this state and the government of any other state or the United States").  The State never provided the Court with the Governor's transmittal to Congress.  But the Senate Report says what the Governor asked for.  "The purpose of S. 415 is to amend the Arizona Statehood and Enabling Act *to conform it to the constitutional changes adopted by the Arizona voters in 1998 and to make the changes requested by the Governor of Arizona*."  S. Rep. 106-59, at 1 (1999) (emphasis added).

###### C.     There is no indication in the history of the 1999 Enabling Act Amendments that Congress thought it was abrogating its future trust oversight authority.

The 1999 Enabling Act Amendments were Congress's consent to the 1998 state constitutional amendment.  The House Report was clear about the Amendments' purpose: "to protect the permanent trust funds of the State of Arizona from erosion due to inflation and modify the basis on which distributions are made from those funds."  H.R. Rep. No. 106-140, at 1 (1999).  Congress was particularly concerned because inflation was eroding away the value of the trust.  *See id.*, at 1-2.  For over 50 years "the income generated from the Funds ha[d] grown at less than the rate of inflation."  *Id.*, at 1-2.  Congress found that the Enabling Act's "stringent investment restrictions" were "outdated and no

longer advisable," as they limited the State's ability "to earn high returns and . . . to reduce risk through investment diversification." *Id.*, at 2.  The Senate Report reinforced the House's: "By law, the principal of the fund [had to be] invested in interest bearing securities.  This requirement prevent[ed] the State from taking advantage of opportunities in the financial markets and from reinvesting some of the earnings of the fund to offset inflation." S. Rep. 106-59, at 2.

"To make the necessary changes to allow the State trust Funds to be managed differently, it is necessary for Congress to approve of the changes as well as amend the Arizona Enabling Act."  H.R. Rep. 106-140, at 2.  As one congressman put it, "These changes have been approved by the voters in Arizona, but because they alter the original statehood act, Congress must approve them as well."  145 Cong. Rec. H6774 (1999) (statement of Rep. Miller).  The Congressional Budget Office cost estimate said, "H.R. 747 would amend the Arizona Statehood and Enabling Act of 1910 and would consent to amendments to the constitution of the state of Arizona approved by the voters on November 3, 1998.  These amendments generally concern the administration of the state's permanent trust funds.  Congressional consent to the amendments to the constitution of the state of Arizona is required before they can be implemented by the state government." H.R. Rep. 106-140, at 3; S. Rep. 106-59, at 3.

An Arizona congressman emphasized the narrow scope of the 1999 Amendments: "This bill makes two *minor changes* to the Arizona Enabling Act relating to the administration of state trust funds."  145 Cong. Rec. H6774 (statement of Rep. Stump) (emphasis added).  The Senate Report also states the exclusivity of those narrow changes.  *See* S. Rep. 106-59, at 2 ("This bill amends the . . . Enabling Act by making two changes requested by the Governor and the State Legislature.").

The State's and its supporters' peripheral arguments show desperation rather than inspiration.  Assuming the obvious, that the 1999 Enabling Act amendments did not extinguish the need for future congressional approval of future changes, they say the State can dispense with approval anyway.  But the Federal Government has not

1    "acquiesced by failing to take enforcement action on Arizona's (and New Mexico's)

2    previous unapproved amendments."  (Doc. 77 at 8.)  Arizona first breached the trust in

3    2012 and much more egregiously again in 2016.  This litigation followed immediately.

4    Congress cannot take "enforcement action" anyway.  Only the executive can.  Like any

5    settlor of any trust, the United States could seek enforcement through the Attorney

6    General, as the Enabling Act expressly says.  310 Stat. at 575 ("It shall be the duty of the

7    Attorney-General of the United States to . . . enforce the provisions hereof relative to the

8    application and disposition of the [ ] lands.")  But a settlor's inaction, brief or long, does

9    not deprive beneficiaries of their property rights and remedies in the trust.

10        There is no issue here of long-standing federal agency interpretation and later

11    congressional reenactment of statutes without concern.  There is no issue here of agency

12    action at all.  Recent statements by Senators or Congressmen about the meaning or intent

13    of past legislation are irrelevant and may not be considered by a court interpreting the

14    legislation.  *See Edwards v. Aguillard*, 482 U.S. 578, 596 n.19 (1987) ("The Court has

15    previously found the postenactment elucidation of the meaning of a statute to be of little

16    relevance in determining the intent of the legislature contemporaneous to the passage of

17    the statute."); *Pierce v. Underwood*, 487 U.S. 552, 566 (1988) ("[I]t is the function of the

18    courts and not the Legislature . . . to say what an enacted statute means."); *Tax &*

19    *Accounting Software Corp. v. United States*, 301 F.3d 1254, 1266 (10th Cir. 2002)

20    ("Congress cannot retroactively change the meaning and intent of previously enacted

21    statutory language through the introduction of legislative history which purports to state

22    what the original meaning of that statutory language was.  Congress must change the

23    wording of the statute itself if it wishes to change the meaning of the statute.").

24

25        **D.    The amendment to New Mexico's Enabling Act demonstrates that**
         **Congress did not relinquish its control over that state's trust lands**

26        **either.**

27        Members of Congress and others stated often that Arizona's requested consent

28    was similar to the consent Congress had given for New Mexico amendments two years

- 16 -

earlier.  *See, e.g.,* 145 Cong. Rec. H6774 (statement of Rep. Saxton) ("This legislation is almost identical to a bill that we passed the last Congress that amended the New Mexico Enabling Act."); *Hearing on S. 415, S. 416, and S. 607*, 106th Cong. 2 (statement of Sen. Kyl) ("This amendment is similar to the change that was granted to New Mexico in 1997."); *id.* at 3 (statement of Scott K. Celley) ("This is a change that is virtually identical to the change made in the New Mexico Enabling Act 2 years ago."); S. Rep. 106-59, at 2 ("A similar change to the New Mexico Statehood Act was made in 1997.").

Congress did not abrogate its future control over changes in New Mexico's trust fund distribution methods by cross-referencing the state constitutional terms that Congress was approving.  To the contrary, Congress was particularly focused on the distribution issue, with the Senate Report noting that Congress had allowed New Mexico to invest in equity securities back in 1957.  *See* S. Rep. No. 105-18, at 2 (1997).  That Enabling Act amendment did not specify how to measure distribution of the funds from the new investments.  *See id.*  In 1996, New Mexico's voters approved a new distribution formula.  *Id.*  As the Senate Report noted, Congress needed to "amend the Enabling Act and consent to the amendments."  *Id.*

As with the Arizona amendments two years later, Congress expressed its consent to the New Mexico changes by cross-reference, not by restating them *in haec verba* in the Enabling Act amendments.  "Distributions from the trust funds shall be made as provided in Article 12, Section 7 of the Constitution of the State of New Mexico."  *Id.*, at 5-6.  New Mexico had similarly presented Congress with a detailed distribution formula.  *See* N.M. Const. art. 12, § 7(F) (1997).[3]  Just as with Arizona's 1999 Enabling Act amendments, a congressman emphasized the narrowness of the New Mexico amendments: "All this legislation does is amend the New Mexico Statehood and

---

[3] "The annual distributions from the fund shall be one hundred two percent of the amount distributed in the immediately preceding fiscal year until the annual distributions equal four and seven-tenths percent of the average of the year-end market values of the fund for the immediately preceding five calendar years.  Thereafter, the amount of the annual distributions shall be four and seven-tenths percent of the average of the year-end market values of the fund for the immediately preceding five calendar years."

1    Enabling Act so it is in conformity with [the changes to] the New Mexico Constitution."

2    143 Cong. Rec. H5835 (statement of Rep. Skeen).

3           The record is equally clear that Congress was approving a specific distribution

4    method, one that was expected to be conservative enough to allow New Mexico to retain

5    some of the earnings as additions to principal.  "The modifications include changing the

6    payout to a fixed percentage of the fund, thereby allowing a portion of the interest and

7    dividend income received to be reinvested."  143 Cong. Rec. H5835 (statement of Rep.

8    Saxton).  Congress used the same language to amend Arizona's Enabling Act as it did for

9    New Mexico, cross-referencing specific terms stated in detail in the respective state

10   constitutional amendments.

11          The Court has reviewed in its entirety all legislative materials concerning the 1997

12   consent to the New Mexico amendment of its trust fund distribution formula, as it has for

13   the 1999 congressional consent to the 1998 Arizona constitutional amendment.  It is all

14   recounted above.  In not a single place does the history of either consent even *suggest*

15   that Congress was relinquishing its oversight authority under either state's Enabling Act.

16   Instead, that history reveals narrow purposes behind both amendments.  For Arizona

17   those purposes were eliminating inflation erosion of the permanent fund, allowing

18   investment flexibility in equity securities, and instituting five-year averaging of income,

19   the exclusive measure of what could be distributed.  Nowhere in the history does anyone

20   request or suggest that Congress give unfettered discretion to either state or that it was

21   abdicating its oversight obligations under either state's Enabling Act.  Ceding oversight

22   authority entirely would not have been a "minor change[ ]."  145 Cong. Rec. H6774

23   (statement of Rep. Stump).

24
25   **III.    PROPOSITION 123**

26
27          **A.    Prelude: The 2012 Amendment to the Distribution Formula**

     In 2012 Arizona amended its distribution formula without seeking Congress's
28   approval.  Article 10, Section 7(G) stayed the same, with this added proviso in Section

1    7(H): "Notwithstanding any other provision of this section, the annual distribution from

2    the permanent funds for fiscal years 2012-2013 through 2020-2021 shall be two and one-

3    half per cent of the average monthly market values of the fund for the immediately

4    preceding five calendar years."  In other words, for a decade, the State wanted to take a

5    flat percentage of the average market values of securities and income for the preceding

6    five years—without regard to whether it was income or principal, and in violation of the

7    1999 formula in Section 7(G) for calculating actual income.

8         The excess distributions from the school trust fund taken under the 2012

9    constitutional amendment remain within remedy unless they were validated by the March

10   23, 2018 congressional consent, which does not speak to them.

11        The statement of State Treasurer and Chair of the Arizona Board of Investment

12   Doug Ducey in the publicity pamphlet for the referendum election said:

13

14        Prop 118 allows us to simplify the formula for education funding, ensuring that
          money will be distributed to support K-12 education each year from Arizona's
15        Permanent Land Endowment Trust Fund.  Best of all, it accomplishes this with
          NO new taxes and NO additional general funding.
16        . . .
17        . . . [T]he formula used to distribute earnings was critically flawed.   Its
          complications have resulted in uneven and unpredictable outcomes—including a
18        year [2010] when ZERO dollars were distributed for K-12 education.  If left
          unchanged, this current formula would likely result in several additional years—
19        over the next decade—of zero dollar distributions.
20
21   Initiative and Referendum Publicity Pamphlet: Pamphlets Containing Measures to Be

22   Submitted  to  the  Electors  of  Arizona,  Arizona  Secretary  of  State  (2012),

23   http://azmemory.azlibrary.gov/cdm/ref/collection/statepubs/id/10531.  That had to mean

24   the average income and stock gains and losses for the five proceeding years were less

25   than zero, which could happen after the State began investing in equity securities, which

26   can lose market value, but could not have happened before the 1999 Enabling Act

27   amendments.  Despite the five-year net lack of income, the State wanted to take 2.5

28

percent of the fund average every year.[4]   It also abolished the mandatory protection of principal against inflation that Arizona agreed to in the 1998 constitutional amendment and that Congress held the State to in 1999.

The 2012 formula called for invading the principal of the trust for current expenditures.   That violated Congress's fundamental requirement in 1910 and in every change thereafter (until the March 23, 2018 consent) that only income may be spent and the entire principal must be preserved undiminished for future school children.   There was no net income in 2010, no doubt because of the extreme decline in stock values in 2008 and later.   The whole point of the 2012 amendment was to get right at the principal. The new 2.5 percent formula might or might not invade principal in later years, depending on the income for the five preceding years.   It is indisputable that there was some invasion of trust principal under the 2012 amendment.

## B.   The Substantive Changes in Proposition 123

The allure of meeting budget desires without current taxation for current consumption by invading the trust principal in whatever amount the voters approve was too great for the legislature to resist again for long.   A scant four years later the legislature did it again.   The legislature proposed a new constitutional amendment and called a special election in May 2016.   By a 50.9% margin Arizona voters passed Proposition 123.   State of Arizona Official Canvass: 2016 May Special Election - May 17, 2016, Arizona Secretary of State (2016), http://apps.azsos.gov/election/2016/Special/canvass2016special.pdf.

First, Proposition 123 took a one-time retroactive payment of $259,266,200 from the permanent school fund for the 2015-2016 fiscal year.   Ariz. Const. art. 10, § 7(G)(2) (2016).   Lorenzo Romero, director of the Governor's Office of Strategic Planning and Budgeting, estimates this payment was a $172,080,987 increase over what the state

---

[4] It was not necessary to invade principal to even out the new volatility in distributions introduced by the allowance of equity investments.   That could have been taken care of by allowing the State to realize gains in good years and retain a portion of income in the trust for distribution in bad years.

would have otherwise paid out in 2015-2016 under the (illegal) 2012 formula.  (Doc. 77, Ex. B at ¶ 4.)  He does not say what the increase was over the operative 1999 formula.

The amendment also increases the fixed annual distributions until fiscal year 2024-2025.  Ariz. Const. art. 10, § 7(G)(2)-(3) (2016).  The unapproved 2012 amendment took 2.5 percent of the "average monthly market values of the fund for the immediately preceding five calendar years."  Ariz. Const. art. 10, § 7(H) (2012).  Proposition 123 increased those payments from 2.5 percent to 6.9 percent.  Ariz. Const. art. 10, § 7(G)(2) (2016).  Romero estimates that this increase translates to $171,892,390 in additional funds in 2016-2017 and $187,983,978 in additional funds in 2017-2018, again apparently measured from the unapproved 2012 formula, not from the operative 1999 formula.  (Doc. 77, Ex. B at ¶¶ 5, 6.)  There was no point to Proposition 123's new formula unless it too invaded principal at least at first.  The 1999 formula already captured all income, as measured over the five-year average.

The State was repeatedly warned that Proposition 123 did or may violate the Enabling Act, including by not getting congressional consent.  But once more, the State did not submit the 2016 amendment for congressional approval, claiming it need not.  For two years the State implemented the unconsented amendment and took excess funds, perhaps $344,000,000 in unauthorized school trust funds by the State's own estimate.  Just three days ago the State did obtain congressional consent to Proposition 123.

## IV.   PLAINTIFF PIERCE HAS STANDING TO BRING THIS ACTION

The State challenges Pierce's standing to bring this action and moves on that ground to dismiss for lack of subject matter jurisdiction.  Congress explicitly said Arizona citizens can enforce the trust terms against their own state officials by virtue of their trust beneficiary status.  Congress so intended, having seen the frequency and the boldness with which states, left to their own, put federal trust lands and monies to their own better uses in their own ways.

But Congress did not purport to do that by giving Arizona citizens a power to enforce a federal statute in the same way the Executive can take care that the laws be faithfully executed.  The Enabling Act does not create a federal cause of action to remedy breaches of the trust.  *Jones v. Brush*, 143 F.2d 733, 735 (9th Cir. 1944).  Congress instead gave citizens an interest in property, which Congress knew citizens could protect in court under principles of property law and trust law.  Congress further precluded any negative inference that the Enabling Act somehow by implication stripped citizens of those traditionally actionable property rights.  "Nothing herein contained shall be taken as in limitation of the power of the State or of any citizen thereof to enforce the provisions of this act."  310 Stat. at 575.

"The precise right conferred by this language has generally not been discussed in case law interpreting the New Mexico-Arizona Enabling Act.  However, in Arizona it is abundantly clear that our courts have interpreted § 28 to permit members of the public to sue for violations of the Enabling Act."  *Mayer Unified Sch. Dist. v. Winkleman*, 220 Ariz. 378, 388, 207 P.3d 631, 641 (Ct. App. 2008), *vacated on other grounds*, 219 Ariz. 562, 201 P.3d 523 (2009) (internal citation omitted).  That might be because Arizona jurisprudence accords standing to members of the public as such, or it might be because Arizona sees the connection between "any citizens" of the State as trust beneficiaries, 310 Stat. at 575, and members of the public.  Arizona law does not need to distinguish between a one-step path and a two-step path, as it gets to the same result either way.  Whether or not federal standing gets there in one step, it does get there by the two-step path.

### A.    A trustee's monetary breach is actionable by beneficiaries.

The letter and spirit of the Enabling Act, originally and until the March 23, 2018 congressional consent, was to manage the lands and fund prudently and to distribute only the income and thus preserve the principal of the trust in "a permanent inviolable fund."  *See id.* at 574.

1    A treatise contemporaneous with the original Enabling Act, Jairus Ware Perry's *A*

2    *Treatise on the Law of Trusts and Trustees*, shows the general environment concerning

3    trust law in 1910, an environment Congress undoubtedly knew.  Perry notes that a trust

4    imposes "an obligation upon a person arising out of a confidence reposed in him to apply

5    property faithfully and according to such confidence."  Jairus Ware Perry, *A Treatise on*

6    *the Law of Trusts and Trustees* § 2 (Edwin A. Howes, Jr., ed., 6th ed. 1911).  A State can

7    also be a trustee: "If a State accepts a trust by grant or bequest, it must act through its

8    legislative powers in administering the trust, or in creating and appointing agents or

9    officers to perform the duties [ ] it assumes."  *Id.* § 41.  Critically, the "powers and

10   directions given in the trust instrument must be strictly followed."  *Id.* § 460.  "If there

11   are directions in the instrument of trust as to the time, manner, and kind of investment,

12   the trustees must follow the direction and power so given them."  *Id.* § 452.  "Trustees

13   cannot make a profit from the trust funds committed to them. . . .  [T]he trustees must

14   account for every dollar received from the use of the trust-money, and they will be

15   absolutely responsible for it if it is lost."  *Id.* § 429 (internal citation omitted).  An

16   injunction to compel a trustee's proper performance under the trust terms has long been

17   the beneficiary's right.  *Id.* § 816.  So it was also at the time of the 1999 Enabling Act

18   amendments. The Restatement (Second) of Trusts § 164 (1959) confirmed that the

19   "nature and extent of the duties and powers of the trustee are determined by the terms of

20   the trust."  Further, a "trustee is under a duty to the beneficiary to use reasonable care and

21   skill to preserve the trust property."  *Id.* § 176.

22   A "breach of trust is a failure by the trustee to comply with any duty that the

23   trustee owes, as trustee, to the beneficiaries . . . of the trust."  Restatement (Third) of

24   Trusts § 93 (2012).  In light of Arizona's unauthorized implementation of its 2012 and

25   2016 over-distributions for current expenditures, Arizona was, until after March 23,

26   2018, plainly in breach of the trust terms of the Enabling Act for the benefit of future

27   school children.[5]   Actions by beneficiaries against trustees for remedy of wrongful

---

28

[5] Nor is it any answer to say that the beneficiaries amended the trust in enacting
the 2012 and 2016 amendments.  Modifying an irrevocable trust requires the consent of

distributions of trust property are cases or controversies that can be heard in federal court. To all appearances, illegal dissipation of trust property is a paradigmatic case or controversy. The Court finds no case that has ever held otherwise. This would be the first.

### B. The citizens of Arizona are the beneficiaries of the trust, of which the State is only the trustee.

The citizens of the State are the beneficiaries of all the trust lands. "A person is a beneficiary of a trust if the settlor manifests an intention to give the person a beneficial interest." Restatement (Third) of Trusts § 48 (2003). The citizens of Arizona were the express beneficiaries of these trusts by virtue of the language of the Enabling Act, which preserved their rights to enforce breaches of trust. *Cf. id.*, cmt. a. "By the terms of a trust, the settlor may reserve or confer upon others the power to enforce the trust. The holder of such a power has standing, on behalf of the beneficiaries, to bring suit against the trustee, although the power does not prevent a beneficiary from acting on his or her own behalf." Restatement (Third) of Trusts § 94, cmt. d(1) (2012).

The Arizona Supreme Court has uniformly and strictly enforced the Enabling Act and the trust terms of the State's Constitution. In *Murphy v. State*, 65 Ariz. 338, 181 P.2d 336 (1947), the court approvingly described what had happened when New Mexico violated the Enabling Act: "We may summarize [state and federal cases arising in New Mexico] by saying that together they establish that *every act of the legislature that in any manner circumvents the plain provisions of the Enabling Act is struck down as unconstitutional and void*." *Id.* at 353, 181 P.2d at 346 (emphasis in original). More recently, in *Rumery v. Baier*, 231 Ariz. 275, 294 P.3d 113 (2013), the Arizona Supreme Court held unconstitutional a state statute that diverted moneys from state trust lands into a management fund—in effect charging the fund a fee for administration. *Id.* at 280, 294 P.3d at 118. In so concluding, the court expressly noted that trust law governs. *Id.*

---

*all* beneficiaries—and when the modification is inconsistent with a material purpose of the trust, it also requires the settlor's consent. *See* Restatement (Third) of Trusts § 65 (2003).

- 24 -

Under the common law of trusts, a trustee would be entitled to reasonable compensation. "But a trustee's common law powers may be limited by the terms of the trust. Here, Article 10, Section 7(A) directs the state treasurer to deposit trust proceeds into a permanent fund. This constitutional language, not being subject to implied exceptions, controls over the common law of trusts." *Id.*

*Kadish v. Arizona State Land Department,* 155 Ariz. 484, 747 P.2d 1183 (1987), *aff'd sub nom. ASARCO Inc. v. Kadish,* 490 U.S. 605, 630 (1989), was a taxpayer action challenging a state statute that authorized a flat-rate, rather than appraisal, valuation of minerals whose sales funded the school trust fund. *Id.* at 485-86, 747 P.2d at 1184-85. "[W]hatever the overall benefit to the state of a flat net rate scheme, we do not believe that a statute that makes it possible to dispose of trust assets without payment of true value can be upheld under the trust duty concept required by the Enabling Act." *Id.* at 497, 747 P.2d at 1196.

On certiorari, the United States Supreme Court stated in dictum that the *Kadish* parties lacked Article III standing. *ASARCO,* 490 U.S. at 616-17. Taxpayer standing failed because the theories of increased taxes caused by lesser revenue from the school fund were too speculative.[6] *Id.* at 614. The school plaintiffs' claim to special harm was insufficient too. *Id.* at 614-15. Those findings were dicta because the defendants otherwise had standing in the Supreme Court from the harm done to them by the adverse judgment in the state supreme court. *Id.* at 617-24.

The Court does not need to address the dictum in *ASARCO* about the standing of the school plaintiffs, to which four concurring justices objected as dictum and alternatively disagreed as erroneous. *Id.* at 633-34 (Brennan, J., concurring in part and concurring in the judgment). The tally was 5 to 4. But in the mathematics of dicta, 5-4 is a standoff. So is every other number. The *ASARCO* opinion does not even offer dicta on

---

[6] Pierce does not assert taxpayer standing from the possibility of higher taxes. Moreover, there is no possibility of higher taxes from Proposition 123 until it expires in 2025 and principal from the trust funds is no longer taken for current school expenses.

1   the trust-law principles and causes of action on which this order relies for standing and

2   case or controversy.

3

4       **C.    A beneficiary has standing and a case or controversy in federal court to remedy a breach of trust on its own.**

5       The State contends Pierce lacks standing and therefore a case or controversy in

6   federal court.  (*See* Doc. 62.)  In so contending, the State boldly ignores what this lawsuit

7   is and tries to transform it into something else.  The State battles against a strawman of

8   the State's preference, rather than the true adversary, on which the State is silent.

9       To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is

10  fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

11  redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547

12  (2016).  The plaintiff "bears the burden of establishing these elements."  *Id.*  Dissipation

13  of trust property plainly meets those three requirements.  The injury is dissipation of trust

14  funds (indeed, trust principal) on then-current expenditures in breach of the explicit terms

15  of the trust as it then read.  The injury is that the money will not be there for future

16  children as the settlor directed.  That injury is traceable to conduct of the Defendant, who

17  took the money and spent it.  An injunction to stop spending those funds until the past

18  misappropriation is recouped will redress the injury.  The redress is not just likely; it is

19  certain.

20      In trust law the "injury in fact" for a case or controversy needs only to be the

21  violation of the terms of the trust.  A beneficiary has standing to protect the trust res,

22  regardless of whether he will ever benefit personally from the trust res.  In *Scanlan v.*

23  *Eisenberg*, 669 F.3d 838 (7th Cir. 2012), a contingent beneficiary brought an action to

24  compel the trustee to comply with trust terms in the management of the trust.  *Id.* at 840-

25  41.  The district court held the beneficiary's interest in the trust was "limited to her

26  interest in potential discretionary payments," and "without an injury to that specific

27  interest" she lacked an injury in fact.  *Id.* at 842 (emphasis removed).  The Seventh

28  Circuit held otherwise.  "We see no reason why canonical principles of trust law should

not be employed when determining the nature and extent of a discretionary beneficiary's interest for purposes of an Article III standing analysis." *Id.* at 843. A "beneficiary's standing is not based on an absolute entitlement or a probability of receiving trust assets. The mere fact that a beneficiary may ultimately never receive trust assets does not prevent that beneficiary from bringing a claim. For example, a contingent beneficiary can bring an action against the trustee—even though his interest is remote and contingent—to protect his possible eventual interest, i.e., to protect and preserve the trust res." *Id.* at 844.

The *Scanlan* court held the contingent beneficiary has standing to maintain an action to compel the trustee to comply with the trust administration terms, even though it was unforeseeable whether the trustee's violation would ever result in monetary injury to the contingent beneficiary. *Id.* at 846-47. A breach of trust terms is remediable in itself, without having to show that unknowable future contingencies will cash out in monetary harm to the plaintiff beneficiary individually. The trustor and the beneficiaries are entitled to have the trust administered the way the trustor chose and do not have to wait and see whether a different way chosen by the trustee turns out bad. That traditional cause of action subsumes standing and creates a case or controversy in federal court.

### D.   Pierce and all citizen trust beneficiaries suffered an injury in fact.

The State argues, without speaking to the substantive rights of trust beneficiaries, that "[v]indicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992). The State would write out of federal court the established right of beneficiaries, on the strength of their beneficiary status alone, to maintain an action "to protect and preserve the trust res." *Scanlan*, 669 F.3d at 844.

Supreme Court standing and case or controversy jurisprudence encompasses claims "where a harm is concrete, though widely shared." *Fed. Election Comm'n v.*

1   *Akins*, 524 U.S. 11, 24 (1998).  In *Akins* voters sued to review the Federal Election

2   Commission's declination to enforce the disclosure requirements of the Federal Election

3   Campaign Act of 1972 (FECA) against the American Israel Public Affairs Committee.

4   *Id.* at 14-16.  The Court held Congress created a federal statutory right of voters to the

5   information FECA required to aid their informed voting.   The Court rejected the

6   contention that standing is categorically excluded if the plaintiff's harm is "shared in

7   substantially equal measure by all or a large class of citizens."  *Id.* at 23 (quoting *Warth v.*

8   *Seldin*, 422 U.S. 490, 499 (1975)).   Though various cases say that a "generalized

9   grievance" is not the kind of harm that confers standing, the Court clarified:

10          The kind of judicial language to which the FEC points, however, invariably
11   appears in cases where the harm at issue is not only widely shared, but is also of
     an abstract and indefinite nature—for example, harm to the "common concern for
12   obedience to law."  [Citing cases.]

13          Often the fact that an interest is abstract and the fact that it is widely shared
14   go hand in hand.  But their association is not invariable, and *where a harm is*
     *concrete, though widely shared, the Court has found "injury in fact*."  [Citation.]
15   *Thus the fact that a political forum may be more readily available where an injury*
16   *is widely shared . . . does not, by itself, automatically disqualify an interest for*
     *Article III purposes.  Such an interest, where sufficiently concrete, may count as*
17   *an "injury in fact*."  This conclusion seems particularly obvious where (to use a
18   hypothetical example) large numbers of individuals suffer the same common-law
     injury (say, a widespread mass tort) . . . .
19

20   *Id.* at 24 (emphasis added).  Our Circuit has further explained *Akins*:
21

22          [T]he most recent Supreme Court precedent appears to have rejected the notion
     that injury to all is injury to none for standing purposes.  Instead, recent precedent
23   holds that a generalized injury, by itself, is no bar to standing.  A concrete actual
24   injury, even though shared by others generally is sufficient to provide injury in
     fact.  It appears to be abstractness, not wide dispersal, of an injury that may
25   prevent the injury from being sufficient to confer standing.

26   *Covington v. Jefferson Cty.*, 358 F.3d 626, 651 (9th Cir. 2004) (internal citation omitted).

27          The *Akins* clarification of standing principles is not a change in standing doctrine.

28   It just recognizes that judicial language speaks to facts before the court and cannot

- 28 -

capture all other circumstances not then before the court.  General language is not always a categorical rule.  It can be just a general description that is usually true.

Indeed, the real focus of cases like *Lujan* and *Spokeo* is on bare procedural injuries.  An "injury to [an] interest in seeing that certain procedures are followed [is] not normally sufficient by itself to confer standing."  *Akins*, 524 U.S. at 23-24 (citing *Lujan*, 504 U.S. at 572-78).  The Supreme Court has limited Congress's ability to grant standing to enforce the general public policy behind a statute where the bare violation of the statute is the only "harm" alleged.

In *Spokeo* the plaintiff alleged that the defendant's website posted inaccurate information about him and in so doing violated the Fair Credit Reporting Act.  136 S. Ct. at 1546.  "[Plaintiff's] profile, he asserts, states that he is married, has children, is in his 50's, has a job, is relatively affluent, and holds a graduate degree.  According to [his] complaint, all of this information is incorrect."  *Id*.  In other words, aspects of the plaintiff's profile made him appear better off than he actually was—and the Court remanded the case for the court below to consider whether this was actual "concrete" harm.  *Id.* at 1545.  The mere procedural violation of the Fair Credit Reporting Act does not necessarily suffice for a case or controversy.

The standing rule against bare enforcement of a statute does not undercut traditional state-law causes of action.   In identifying the citizens as beneficiaries, Congress did not create a cause of action.  Congress left it to the traditional state-law cause of action of a beneficiary to prevent or remedy a violation of trust terms.  That cause of action does not require a present harmful consequence from the deviation from the terms of trust.  Nor does the number of beneficiaries negate that traditional right or transform it into a purely public one to merely enforce the public policy of a statute.

As Justice Thomas observed in his *Spokeo* concurrence, "the concrete-harm requirement does not apply as rigorously when a private plaintiff seeks to vindicate his own private rights."  136 S. Ct. at 1552 (Thomas, J., concurring).  "Common-law courts more readily entertained suits from private plaintiffs who alleged a violation of their own

rights, in contrast to private plaintiffs who asserted claims vindicating public rights. Those limitations persist in modern standing doctrine." *Id.* at 1550. Private rights include, among other things, property rights. *Id.* at 1551. "In a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a de facto injury merely from having his personal, legal rights invaded. Thus, when one man placed his foot on another's property, the property owner needed to show nothing more to establish a traditional case or controversy." *Id*. Here, the State more than put its foot on another's property. It mined the gold and took it.

It does not matter that the Arizona Education Association, Arizona School Boards Association, and Arizona Association of School Business Officials supported Proposition 123 in the official publicity pamphlet. Initiative and Referendum Publicity Pamphlet: Pamphlets Containing Measures to Be Submitted to the Electors of Arizona, Arizona Secretary of State (2012), http://azmemory.azlibrary.gov/cdm/ref/collection/statepubs/id/10531. They also filed an amicus brief in this case. (*See* Doc. 92.) The schools' current incentive to get extra money for their current needs is at odds with the interests of future Arizona students. Congress's conscious plan to vest all citizens with property rights in the trust was necessary to uphold the trust against collusive violations.

### E.       This Court has federal question jurisdiction.

The State does not challenge the federal question subject matter jurisdiction of this Court. *See* 28 U.S.C. § 1331. Nevertheless, it merits summarizing why there is federal question jurisdiction. Though the cause of action is under state law, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). In such cases, "jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum, which can be vindicated without disrupting Congress's intended division of labor between state and

federal courts." *Id.* (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005)) (internal quotation marks omitted).

This case turns on the federal question of the meaning and effect of the 1999 amendments to the Enabling Act, particularly whether Congress abrogated its oversight authority over changes in the school trust lands fund. The parties hotly dispute this, as even now the State maintains it was not required to obtain the congressional approval it ultimately did obtain. (*See* Doc. 112 at 2 ("Governor Ducey and the State of Arizona continue to maintain that [Congress's] consent was unnecessary."). That question is substantial, as this order shows. This case now also turns on the meaning and effect of the March 23, 2018 congressional consent. This Court has federal question subject matter jurisdiction over his case.

## V.   REMEDY FOR PAST VIOLATIONS AND FURTHER BRIEFING

The objective of damage relief and injunctive relief is the same. It is to undo the actionable harm done. *See, e.g., Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (explaining that equitable remedies must be fashioned according to "the nature and scope of the [ ] violation" and "designed as nearly as possible to restore the victims . . . to the position they would have occupied in the absence" of the violation (internal quotation marks omitted)). Plaintiff sued for injunction only.

"With limited exceptions, the remedies of trust beneficiaries are equitable in character and enforceable against trustees in a court exercising equity powers." Restatement (Third) of Trusts § 95 (2012). "A beneficiary is not prevented from pursuing an equitable remedy against a trustee merely because under common-law principles, or perhaps an occasional statute, the beneficiary is allowed to bring an action at law against the trustee for the same cause." *Id.*, cmt. a. Possible equitable remedies are broad and include issuing "orders or taking such other action as may be appropriate to the circumstances and in the interest of sound administration of the trust." *Id.*, cmt. c. A.R.S. § 14-11001 lists such remedies, among them compelling "the trustee to perform

the trustee's duties," enjoining "the trustee from committing a breach of trust," and ordering "the trustee to redress a breach of trust by paying money, restoring property or other means." *Id.* § 14-11001(B)(1)-(3).

Plaintiff originally sought an injunction against the Governor in his official capacity from complying with Proposition 123. (Doc. 45 at 7.)  As to fund disbursements accruing for the future, that relief is now moot.  But further briefing is necessary on whether the March 23, 2018 congressional consent to the 2016 amendment of Article 10, Section 7 of the Constitution of Arizona validates (1) the excess fund disbursements in 2016 and 2017 while the 2016 constitutional amendment could not be implemented and (2) the excess fund disbursements in 2012 through 2015 under the unconsented 2012 constitutional amendment.  A full presentation of the legislative history of the March 23, 2018 congressional consent could be highly relevant.  It would also be helpful to examine whether any prior constitutional amendments concerning state trust lands were implemented before receiving congressional consent, and if so, what the consequences were.

If those past excess fund disbursements are not validated by the March 23, 2018 congressional consent to the 2016 constitutional amendment, that harm from the State's breach of trust could be remedied by enjoining withdrawal of future fund disbursements until the amount withheld from future accruals matches the amount Arizona illegally took from the trust fund.

The State's Notice (Doc. 112) suggests the Plaintiff may stipulate to dismiss this case.  Of course, the Plaintiff may elect not to seek further relief and to dismiss his action. If he does so elect, it will moot the briefing schedule ordered hereinafter.

IT IS THEREFORE ORDERED that the State of Arizona's Motion to Dismiss (Doc. 54) and Governor Ducey's Motion to Dismiss (Doc. 56) are denied.

IT IS FURTHER ORDERED that the Defendants' Joint Motion to Dismiss (Doc. 62) is denied, except that the motion to dismiss Claim Two: § 1983, which Plaintiff does not oppose, is granted.

1    IT IS FURTHER ORDERED that Plaintiff's Motion for Preliminary Injunction

2    (Doc. 45) is terminated as moot in light of its consolidation with trial on the merits.

3    IT IS FURTHER ORDERED that the parties submit further briefing on whether

4    the March 23, 2018 congressional consent to the 2016 amendment of Article 10, Section

5    7 of the Constitution of Arizona validates (1) the excess fund disbursements in 2016 and

6    2017 while the 2016 constitutional amendment could not be implemented and (2) the

7    excess fund disbursements in 2012 through 2015 under the unconsented 2012

8    constitutional amendment.  The briefing shall include the full legislative history of the

9    March 23, 2018 congressional consent and shall explore whether any prior constitutional

10   amendments concerning state trust lands were implemented before receiving

11   congressional consent and, if so, what the consequences were.

12   IT IS FURTHER ORDERED that counsel confer and submit by April 4, 2018, a

13   joint proposal or separate proposals for a schedule for such briefing.

14   Dated this 26th day of March, 2018.

15

16

17   _____

18            Neil V. Wake
         Senior United States District Judge

19

20

21

22

23

24

25

26

27

28