**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Pierce,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Douglas A. Ducey, in his capacity as Governor of the State of Arizona,<br><br>　　　　　Defendant. | No. CV-16-01538-PHX-NVW<br><br>**ORDER** |

Before the Court is Plaintiff's Motion for Entry of Final Judgment on the Merits (Doc. 122) and the responses and replies thereto. The responses principally contend that the case is now moot and beyond the jurisdiction of this Court to enter a merits judgment. The Motion will be granted and a declaratory judgment entered as follows:

> Declaratory judgment is granted in favor of Plaintiff against the Governor of the State of Arizona and his successors in office and those acting on his behalf that the Arizona Statehood and Enabling Act Amendments of 1999, Pub. L. No. 106-133, 113 Stat. 1682 (1999), do not repeal or impair the Enabling Act requirement of congressional consent to any changes to the Arizona State Constitution that affect the investment or distribution of the assets in the School Land Trust Fund established by the Arizona Statehood and Enabling Act until and unless Congress provides consent to such changes, by way of amendment to the Arizona Statehood and Enabling Act or otherwise.

This case is governed by the principle that voluntary cessation of challenged conduct that can recur does not moot a case and does not deprive a federal court of jurisdiction to enter a merits judgment. The State of Arizona has twice—in 2012 and again in 2016—amended its Constitution to allow greatly increased withdrawal of School Land Trust funds without congressional consent as required by the Arizona Enabling Act. The State and its officers took those monies illegally and spent them. Before and after this suit in 2016, the defendants vociferously proclaimed that they no longer needed congressional consent and persisted in that position through two years of litigation. But on the eve of a ruling in this Court, they obtained a consent in the Consolidated Appropriations Act, 2018, at pages 1803-94 of that 2400-page bill. Yet even as defendants informed this Court that they had obtained the consent, they proclaim still that no such consent was required and that the State could take any amount of School Land Trust funds by merely amending its Constitution. That was a strategic one-time voluntary cessation, repudiated immediately.

Defendants say this case is now moot because the 2016 Arizona Constitutional Amendment has received congressional consent, which need not be obtained again. But the defendants constrict too narrowly the voluntary cessation exception to mootness. Dismissal as moot would leave the State free to take other increased monies from the School Land Trust without congressional consent in the future, just as it has done twice recently and threatens to do again. The State and the Governor have not disavowed such repetition and have proclaimed their ability to do it again. A voluntary cessation joined with a threat to do it again is the paradigm of unsuccessful blunting of power to adjudicate with its attendant effects of res judicata and assessment of costs and fees. This case is a poster child for the doctrine of voluntary cessation not mooting a case or controversy.

**I.    ARIZONA'S PATTERN AND CONTINUING THREAT OF ILLEGALLY TAKING FUNDS FROM THE SCHOOL LAND TRUST FUND WITHOUT CONGRESSIONAL CONSENT**

Arizona has followed a long-term policy of cutting funding for public education.

> In the early 1990s, Arizona ranked 34th in the nation in per pupil funding, when we invested 87% of the national average. By 2015, Arizona was only investing 65% of the national average, dropping our ranking to 48th. We also rank at or near the bottom of all national studies comparing teacher pay among states.

*Funding PreK-12 Education,* Arizona Town Hall*,* at 11 (Nov. 2017), https://azmemory.azlibrary.gov/digital/collection/statepubs/id/32140/rec/1.

Arizona's decline in public school funding parallels other polices. First is tax cutting in general, which has been endemic since the 1990s. School choice is promoted by charter schools, which receive state funding and at a per pupil rate higher than public school students receive. Tax credits for private school tuition divert tax revenues to private schools. The public schools' slice of the pie has been shrinking, and so has the whole pie.

This led to a statute ratified in a 2000 referendum that required the Legislature to increase public school funding annually by the greater of 2% or the rate of inflation. A.R.S. § 15-901.01. That set a floor on the decline in public school funding. But the Legislature consistently defied that statute by denying the annual increase. After a dozen years of no increases, the Arizona Supreme Court held the Legislature's refusal was unlawful and ordered a declaratory judgment against the State and remanded for further proceedings for remedy. *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 308 P.3d 1152 (2013). The declaratory judgment alone required a minimum increase of 24% in the school funding for the next year, assuming only the minimum 2% annual increase for the lost 12 years. The Legislature did not do even that.

The long pendency of that litigation led state leaders to hit on the idea of funding the school spending shortfall from the School Land Trust Funds. In 2012 the Legislature proposed a Constitutional Amendment to allow spending 2.5% annually of the School Trust Fund, regardless of earnings and gains in the fund and in disregard of losses in the fund, as had happened in the years after the 2008 stock market crash. "Best of all, it accomplishes this with NO new taxes and NO additional fund spending." Doug Ducey et al., Argument for Proposition 118, *in Arizona General Election Guide*, Secretary of State Ken Bennett, at 47, https://apps.azsos.gov/election/2012/Info/PubPamphlet/english/e-book.pdf. The voters enacted that Amendment, and the State just took the money, without

getting or even seeking the congressional approval required by the Enabling Act. As discussed in the March 26, 2018 order, 2018 WL 1472048, there was no credible or even colorable basis to forego that approval. The State just took the money and spent it. No one sued in 2012 to stop them from doing that.

That easy run on the School Land Trust was repeated and expanded a scant four years later to meet the State's next funding crisis after the *Cave Creek* case. State leaders settled on the same strategy to avoid raising the taxes needed to comply with that decision. The Legislature proposed another increase in withdrawal from the School Land Trust fund from 2.5% annually to 6.9% annually occasioned by the *Cave Creek* decision, thus "settling" that case entirely with School Land Trust Fund monies.

According to the Governor, "Proposition 123 is our innovative way of ensuring that our schools get additional sustainable funding now in into the future—without raising taxes. . . . Proposition 123 . . . settles the education funding lawsuit that has been hanging over our state for too long." Doug Ducey, Argument in Support, *in Arguments Filed in Support of Proposition 123*, at 1, https://apps.azsos.gov/election/2016/Special/PropInfo/123-Pro.pdf. The Amendment was passed by 50.9% of the vote at the special election.

The Governor and the State immediately took $259,266.20 as a one-time retroactive payment for fiscal year 2015-2016. Analysis by the Legislative Council estimated increased payment under Proposition 123 at "more than two billion dollars over that ten-year period." Analysis by Legislative Council, *in What's on My Ballot? Arizona's Special Election Guide*, Secretary of State Michele Reagan at 15, https://azmemory.azlibrary.gov/digital/collection/statepubs/id/28973.

As discussed in the order of March 26, 2018, during two years of litigation, the Governor and the State vigorously contended that the 1999 congressional consent to the 1998 Constitutional Amendment not only approved that amendment but also silently repealed the need for future congressional consent to any future amendment changing or increasing the withdrawals from the School Land Trust. The Governor and the State withdrew those funds from 2016 to March 26, 2018, without consent of Congress, just as they had from 2012 to 2015 under the 2012 amendment.

The Governor obtained a one-page insert into the 2400-page Consolidated Appropriations Act, 2018 that consented to Proposition 123. That bill was enacted without disclosure to the public or to the Senators and Congressmen who voted on it. By a filing on March 23, 2018, informing the Court of the congressional consent, the Governor and the State disavowed any concession of the merit of Plaintiff's claim and affirmed their position that no congressional consent is necessary, admitting that they got the consent to prevent a merits adjudication without disavowing their conduct. "While Governor Ducey and the State of Arizona continue to maintain that such consent was unnecessary, the issues and arguments raised by Plaintiff in this above-captioned litigation are mooted by the 2018 Act." (Doc. 112 at 1.)

## II. GOVERNING LAW

### A. Mootness in General

"Article III of the United States Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 861 (9th Cir. 2017) (citing U.S. Const. art. III, § 2, cl. 1)). This limitation "requires those who invoke the power of a federal court to demonstrate standing—a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). As the Court previously concluded, Pierce demonstrated standing. (*See generally* Doc. 113 at 21-30 (explaining that Pierce has standing to enforce the terms of Arizona's School Land Trust against state officials by virtue of his trust beneficiary status).)

This limitation also requires that a controversy exist "not only at the time the complaint is filed, but through all stages of the litigation." *Already*, 568 U.S. at 90-91 (internal quotation marks and citation omitted). "Where this condition is not met, the case has become moot" and no longer appropriate for judicial review. *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc) (internal citation omitted).

However, "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SEIU, Local 1000*, 567 U.S.

298, 307 (2012). "The question is not whether the precise relief sought at the time the case was filed is still available," but "whether there can be any effective relief." *McCormack v. Herzog*, 788 F.3d 1017, 1024 (9th Cir. 2015) (alteration omitted) (internal quotation marks and citation omitted)). Ultimately, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, 567 U.S. at 307 (internal quotation marks and citation omitted).

### B. Voluntary Cessation Exception to Mootness

It is well-established that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already*, 568 U.S. at 727 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Stated differently, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite*, 455 U.S. at 289. Otherwise, an intransigent defendant could simply "engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already*, 568 U.S. at 727.

Therefore, "the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events make it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal citation omitted) (emphasis added). In addition, it must be clear that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1037 (9th Cir. 2018) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Only when both conditions are satisfied can it be said a case is moot. *County of Los Angeles*, 440 U.S. at 631; *see also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998) ("Defendants have not carried their heavy burden of establishing *either* that their alleged behavior cannot be reasonably expected to recur, *or* that interim events have eradicated the effects of the alleged violation." (emphasis in original)). A defendant's

burden of demonstrating mootness is "a heavy one." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632-33 (1953).

### 1. Recurrence of Wrongful Behavior

A defendant asserting mootness has the "heavy burden" of showing "the challenged conduct cannot be reasonably expected to start up again." *Fikre*, 904 F.3d at 1037. While courts generally presume a government entity acts in good faith when it changes its policy, when it "asserts mootness based on such a change," it bears this burden all the same. *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, ___ F.3d ___, No. 18-15242, 2019 WL 4463289, at *4 (9th Cir. Sept. 18, 2019) (internal quotation marks and citation omitted).

Three factors are examined in determining whether challenged conduct can reasonably be expected to recur. First is the form of the governmental action, which "is critical, and, sometimes, dispositive." *Fikre*, 904 F.3d at 1037. For example, the repeal or amendment of a statute is "usually enough to render a case moot" even if the statute can later be reenacted. *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994). In contrast, "an executive action that is not governed by any clear or codified procedures cannot moot a claim." *McCormack*, 788 F.3d at 1025.

Second is the rationale of the governmental action. When a government entity ceases a challenged policy in recognition of the merit of the challenge, the voluntary cessation exception to mootness is less likely to apply. "[T]he government's unambiguous renunciation of its past actions can compensate for the ease with which it may relapse into them." *Fikre*, 904 F.3d at 1039. For example, in *White*, the plaintiffs' challenged conduct was opposing the conversion of a motel into a multi-family housing unit for the homeless by publicly airing their grievances, rallying the business community to their cause, and challenging the integrity of the Zoning Adjustment Board's decision-making process. *White v. Lee*, 227 F.3d 1214, 1242-44 (9th Cir. 2000). After the Department of Housing and Urban Development ("HUD") investigated the plaintiffs for engaging in a discriminatory housing practice under the Fair Housing Act, they sued for injunction against the HUD investigation. HUD responded by prohibiting the investigation of non-

violent petitioning or lobbying activities, which the Court of Appeals found "represent[ed] a permanent change in the way HUD conduct[ed] FHA investigations," was "broad in scope and unequivocal in tone," and was "fully supportive of First Amendment Rights." *Id.* at 1242-43. HUD's unequivocal cessation mooted the case for injunction against it, and the voluntary cessation doctrine did not suffice to keep it alive. *Id.*

However, when the government ceases a challenged policy without renouncing it, the voluntary cessation is less likely to moot the case. The Ninth Circuit cases are replete with examples of government entities ceasing policies half-heartedly. For example, in *Olagues v. Russoniello*, 770 F.2d 791, 793 (9th Cir. 1985), the plaintiffs sued for monetary and equitable relief in connection with a preliminary investigation led by the United States Attorney for the Northern District of California into possible violations of the Voting Rights Act of 1965. The plaintiffs alleged violations of their federal constitutional rights. *Id.* at 793-94. Even though the investigation was later abandoned, the case was not moot, in part because the U.S. Attorney "did not voluntarily cease the challenged activity because he felt that the investigation was improper." *Id.* at 795. On the contrary, he "ha[d] at all times continued to argue vigorously that his actions were lawful." *Id; see also Porter v. Bowen*, 496 F.3d 1009, 1016-17 (9th Cir. 2007) (finding a letter from the California Secretary of State to the state legislature tolerating the operation of vote-swapping websites pending clarification of the state election code did not moot a lawsuit because "the Secretary has maintained throughout the nearly seven years of litigation . . . that [her predecessor] had the authority under state law to threaten [the plaintiffs] with prosecution.").

Finally, the gravity of the issues at bar and the public interest counsel against finding mootness in cases presenting important precedential issues. *See, e.g.*, *Boise City Irrigation and Land Co. v. Clark*, 131 F. 415, 419 (9th Cir. 1904) (quoted with approval in *S. Pac. Terminal v. ICC*, 219 U.S. 498, 516 (1911) ("[T]he courts have entertained and decided such cases before . . . because of the necessity or propriety of deciding some question of law presented which might serve to guide the [legislative] body when again called upon to

act in the matter.")). The "public interest in having the legality of the practice settled [] militates against a mootness conclusion." *W.T. Grant Co.*, 345 U.S. at 632 (finding an action regarding the meaning of a provision of the Clayton Act was not moot); *see also McCormack v. Hiedeman*, 900 F. Supp. 2d 1128, 1140 (D. Idaho 2013) (noting the "significant public interest in settling the legality of these provisions" of the Idaho abortion statutes and finding "the existence of this interest" was a factor that "suggest[ed] a live controversy"), *aff'd sub nom McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015).

### 2. Eradication of Effects of Wrongful Behavior

A defendant must also demonstrate "interim relief or events have completely and irrevocably eradicated" the effects of the challenged behavior. *Fikre*, 904 F.3d at 1037; *see also Citizens for Quality Educ. San Diego v. Barrera*, 333 F. Supp. 3d 1003, 1025 (S.D. Cal. 2018) ("[V]oluntary cessation moots a case only if (1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely eradicated the effects of the alleged violation." (internal quotation marks and citations omitted)).

## III. ANALYSIS

The Governor contends the voluntary cessation exception does not apply because it was Congress, not the Governor, which enacted the congressional consent to Proposition 123, that consent need not be obtained again for Proposition 123, and that the "mooting event" here is a change in the law. According to the Governor, the act of voluntary cessation was Congress' enactment of the Consolidated Appropriations Act, 2018. However, that misstates the part the Governor played in this story. Congress did not act in a vacuum. The Governor sought and obtained the consent necessary to implement the formula changes. Only the Governor could request that consent. The Governor is the "sole official means of communication between" Arizona and the federal government, A.R.S. § 41-101(A)(4), so the challenged behavior here is that of the Governor and the Governor alone. The Governor's request for consent is the voluntary cessation here.

In short, Pierce opposed the Governor's attempt to implement distribution changes without congressional consent. The Governor resisted for two years but then sought such consent on the eve of a ruling. The Governor's assertion that he somehow was not involved is disingenuous. The Court is not fooled.

Second, the Governor argues this case is moot because congressional consent to Proposition 123 need only be given once and has been received. But that overlooks the gist of Plaintiff's original action—that the Enabling Act requirement of congressional consent was and is still in effect and was not repealed by the 1999 consent to the 1998 Arizona Constitutional Amendment. That issue subsists for the 2012 Amendment and for future amendments and is not mooted by the congressional consent to Proposition 123.

### A. The Governor Disavows the Need for Congressional Consent Before Implementing Distribution Changes

To demonstrate this case is moot, the Governor has the "heavy burden" of showing he cannot reasonably be expected to implement changes to the formula without seeking congressional consent. *Fikre*, 904 F.3d at 1037 (explaining the applicable standard discussed *supra* at 4-6). For the reasons stated below, the Governor has not met this burden.

1. As an initial matter, the Governor's request for congressional consent constitutes an "executive action that is not governed by any clear or codified procedures," and therefore cannot moot Pierce's claim. *See McCormack*, 788 F.3d at 1025 (noting "an executive action that is not governed by any clear or codified procedures cannot moot a claim"); *see also Coral Constr. Co. v. King County*, 941 F.2d 910, 928 (9th Cir. 1991) ("[A] case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the [offending] provision."). Indeed, no procedures governed the Governor's actions here and could constrain the Governor's behavior regarding the implementation of formula changes moving forward except the Enabling Act itself. There is nothing in the parties' submissions or the record to demonstrate the Governor changed his mind about the merits of Plaintiff's claim.

2. It is even more striking that the Governor continues to insist Arizona need not obtain congressional consent to changes in the formula. Indeed, in the very submission in which he announced—on the eve of the Court's decision on the merits ruling—he had sought and obtained congressional consent, he "continue[d] to maintain that such consent was unnecessary" and asked the Court to dismiss this action as moot. (Doc. 112.) The Governor did not experience a change of heart that may counsel against a mootness finding. *See White*, 227 F.3d at 1243-44 (finding HUD's decision to unequivocally change the policy at issue did not fall within the voluntary cessation exception to mootness). Far from seeking congressional consent as a way of showing support for the rights of Arizona citizens as trust beneficiaries, the Governor at the last minute sought consent to moot this litigation and avoid an unfavorable judgment.

In this regard, the Governor is no different than the U.S. Attorney in *Olagues* or the California Secretary of State in *Porter*. Indeed, just as those officials continued to argue the challenged policies they ceased were nevertheless permissible, the Governor argues his belated request for congressional consent was unnecessary and his prior expenditures were permissible without the consent. *See Olagues*, 770 F.2d at 795 (holding a case involving an investigation was not mooted by the cessation of the investigation because the lead investigator "at all times" argued "vigorously that his actions were lawful"); *Porter*, 496 F.3d at 1016-17 (holding a case involving the possible prosecution of vote-swapping websites was not mooted by a letter from the California Secretary of State because "the Secretary . . . maintained throughout the nearly seven years of litigation . . . that [her predecessor] had the authority" to threaten the plaintiffs with prosecution). Not only has the Governor maintained he has the authority to implement changes without any oversight, he has maintained this stance ever since he or his predecessor in office began implementing the 2012 formula changes. The Governor's defiance is striking.

3. Given the importance of the issues at bar to the citizens of Arizona—both present and future—the public interest in having the legality of the Governor's behavior settled weighs against a mootness ruling. *See W.T. Grant Co.*, 345 U.S. at 632 (finding the

"public interest in having the legality of the practices settled [] militates against a mootness conclusion"). The stewardship of the trust fund was of utmost importance to the framers of the Enabling Act, who took great care in crafting "careful and rigid" restrictions on trust lands, S. Rep. No. 61-454 at 18 (1910), and preserved the rights of Arizonans to enforce it. 36 Stat. 557 at 575 ("Nothing herein contained shall be taken as in limitation of the power of the State or of any citizen thereof to enforce the provisions of this act."). Senator Beveridge noted the "extreme care that should be taken with every provision of a bill like this," S. Rep. 61-454 at 33.

4. The Governor's arguments to the contrary are unavailing. Congress's enactment of the Governor's requested congressional consent was not the voluntary cessation in question. The Governor's request for consent was the voluntary cessation. For these reasons, the Governor's discussion of the voluntary cessation standard for legislative action is irrelevant. (Doc. 129 at 5-6.)

*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004), is analogous. In *Demery*, the plaintiffs challenged former-Sheriff Arpaio's use of internet webcams in Maricopa County's Madison Street Jail to broadcast bookings. *Id.* at 1024-25. During the litigation—and before the district court enjoined the use of the webcams—the third-party vendor ceased operations without explanation. *Id.* at 1025-26. Considering the issue of mootness *sua sponte*, the Court of Appeals found the vendor's cessation did not moot the case. *Id.* at 1025, 27. "[T]he immediate cause of the defendant's cessation of the disputed activity was not in the short term voluntary, as it was not Sheriff Arpaio who discontinued the . . . website." *Id.* at 1026. Article III jurisdiction remained because, based on Arpaio's "unequivocal representations," he was likely to reactivate the webcams in the absence of an equitable judgment and was actively looking for a new website to host the images. *Id.*

5. Second, the Governor proclaims himself free to implement changes to the distribution formula without congressional consent, though further consent is not needed for Proposition 123. The Governor argues this case is moot because he has "no control over the constitutional amendment process." (Doc. 129 at 5 n.2.) But the Governor has

sole authority to initiate a request for congressional consent to past or future constitutional amendments enacted by the voters. The Governor has the heavy burden of demonstrating that he or his successors in office will not take new distributions from the School Land Trust Fund without getting congressional approval if such amendments are ever enacted. The burden is on the Governor to show there will be no such future amendments. He has not attempted to do so and cannot.

For voluntary cessation to defeat mootness it is not necessary to show that a future amendment of the Arizona Constitution to draw even more money will happen or even is likely. But it is more than plausible that such an amendment will be sought. It is likely after 2025 when Proposition 123 expires. At that time the State will be habituated to the generous distributions from the School Land Trust to make up for decades of tax cuts and other refusal to fund current education from taxes. That is even more likely due to the Arizona Constitution's one-way ratchet on tax increases since 1992. Ariz. Const. art. XIX sec. 22. That allows a tax cut by a majority vote of the Legislature, but a tax increase only by a two-thirds vote. Even a legislative minority will then be able to force the Legislature to propose a constitutional amendment to retain some or all the school funding now being paid from the School Land Trust.

**B. The Governor Fails to Show His Request for Consent Has Completely and Irrevocably Eradicated the Effects of His Implementation of the Changes to the Formula**

Mootness is further defeated because the Governor has not shown his belated request for consent completely and irrevocably eradicated the effects of the unauthorized distributions. The parties are still litigating issues related to Proposition 118 and Proposition 123 in state court that depend in part on whether the 1999 congressional consent to the 1998 Arizona Constitutional Amendment repealed the need for congressional consents to later amendments. The Governor's requested consent for Proposition 123 has not brought closure, as Pierce currently seeks relief in state court. (Doc. 110, Ex. A, at 11, ¶ 56(a.)) "As long as the parties have a concrete interest, however

small, in the outcome of the litigation, the case is not moot." *Knox*, 567 U.S. at 307 (internal quotation marks and citation omitted).

### C. The Court Shall Enter a Declaratory Judgment

In his Third Amended Complaint, Pierce asks the Court to enjoin the Governor "from implementing any changes to the Arizona Constitution that affect the investment or distribution of the assets in the School Trust Fund . . . until and unless Congress provides such consent to such changes . . . ." In lieu of the permanent injunction that Pierce seeks (Doc. 134 at 6, ¶ 3), the Court in its discretion shall issue a declaratory judgment in the form stated at the beginning of this order.

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

The phrase "case of actual controversy" refers to the type of "Cases" and "Controversies" justiciable under Article III. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007). The test for determining whether a "case of actual controversy" exists is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Co.*, 312 U.S. 270, 273 (1941) (internal citation omitted). For the reasons stated above, this requirement has been met.

While Pierce did not pray for a declaratory judgment, the Court is authorized to enter whatever relief he is entitled to. *See* Fed. R. Civ. P. 54(c) ("Every . . . final judgment [except a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."). Moreover, a declaratory judgment may be entered *sua sponte*. *See Arley v. United Pac. Ins. Co.*, 379 F.2d 183, 187 (9th Cir. 1967) ("True, plaintiff prayed for rescission, but this did not impair the [district] court's power, indeed its duty, to render such judgment as on the entire record the law required to

finally determine the litigation."); *see also Greenfield MHP Assoc's, L.P. v. Ametek, Inc.*, Case No. 3:15-cv-01525-GPC-AGS, 2018 WL 1757527, at *16 (S.D. Cal. Apr. 12, 2018) ("The Ninth Circuit has interpreted Rule 54(c) to mean that declaratory and injunctive relief can be awarded in a case in which the plaintiff did not request such relief in the operative complaint.").

"A declaratory judgment is binding on the parties before the court and is claim preclusive in subsequent proceedings as to the matters declared." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2771 (4th ed. 2016); *see also Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940, 952 (9th Cir. 2004) ("A declaratory judgment is a binding adjudication that establishes the rights and other legal relations of the parties where those rights are in doubt." (internal quotation marks and citation omitted)). Indeed, "[a] court may grant declaratory relief even though it chooses not to issue an injunction," and "[a] declaratory judgment can then be used as a predicate to further relief, including an injunction." *Powell v. McCormack*, 395 U.S. 486, 499 (1969) (internal citations omitted). If the Governor chooses to again ignore the Enabling Act requirement of congressional consent, an injunction would readily follow.

IT IS THEREFORE ORDERED that Declaratory Judgment be entered in the form stated above. The Clerk shall terminate this action.

Dated: September 30, 2019.

_____
Neil V. Wake
Senior United States District Judge